Leo VINE, Plaintiff-Appellant,

v.

BENEFICIAL FINANCE COMPANY, Inc., Defendant-Appellee,

and

Charles H. Dowd, Stuart A. Wixson, George J. Springer, C. H. Donohue and Crown Finance Company, Inc., Defendants.

No. 67, Docket 30500.

United States Court of Appeals
Second Circuit.

Argued Oct. 6, 1966.

Decided March 13, 1967.

---

Lawrence M. Powers, New York City (Berman & Powers, Ira W. Berman, New York City, on the brief), for plaintiff-appellant.

Wilkie Bushby, New York City (Dewey, Ballantine, Bushby, Palmer & Wood, Joseph Schreiber, Robert I. Fisher, New York City, on the brief), for appellee.

Philip A. Loomis, Jr., General Counsel, David Ferber, Solicitor, Roy Nerenberg, Attorney, Securities and Exchange Commission, Washington, D. C., as amicus curiæ, urging reversal.

Before SMITH, HAYS and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge.

This is another of the growing number of cases based upon section 10(b) of the Securities Exchange Act of 1934 ("the Act"), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission. We deal primarily with the first amended complaint of appellant Leo Vine against appellee Beneficial Finance Company, Inc., which alleges violations of both the Act and state law. The District Court for the Southern District of New York dismissed the complaint. Its basic holding was narrow; the federal action failed because Vine was not a "seller" of securities. For reasons elaborated below, we hold that Vine is entitled to invoke the Act, and reverse the order of dismissal.

I.

The amended complaint alleges: Vine, a resident of New York, has owned during all relevant times 100 shares of Class A common stock of Crown Finance Company, Inc., a Delaware corporation with its principal office in Delaware, as is Beneficial. Beneficial and Crown both are in the business of operating small loan offices. The stock of the former, with over a billion dollars in assets, is listed on the New York Stock Exchange; Crown, a much smaller company, has limited over-the-counter trading in its stock. Crown has two classes of common stock, A and B, with equal voting rights except that A designates one-third of the directors and B, two-thirds. In liquidation, a B share equals only one-tenth of an A share, and A has a claim on eighty per cent of sums set aside for payment of cash dividends at any time, while the B stockholders have twenty per cent. There were 624,870 A shares outstanding at the relevant times, and 46,500 B shares outstanding. The officers and directors of Crown were its principal Class B stockholders. Vine's claim is that Beneficial, acting in concert with these officers and directors and using means and instrumentalities of interstate commerce and the mails, defrauded Crown and its Class A stockholders by appropriating for Class B stockholders $900,000 which otherwise would have gone to Class A stockholders, and by merging Crown into Beneficial for at least $800,000 less than the fair market value of Crown.

The complaint describes the mechanics of the fraudulent scheme as follows: While negotiating for the acquisition of Crown in the spring and summer of 1963, Beneficial desired to merge Crown into Beneficial at a cost equal to Crown's book net worth, which in June was about $1,680,000, exclusive of good will. Knowing Beneficial's wishes in the matter, Crown's officers and directors [1] conspired with Beneficial to divert to themselves more than a fair share of the price to be paid for Crown. Although these individuals were minority stockholders, they controlled the board of directors. If Beneficial had acted as it should have (according to Vine) and offered in a merger to give all Crown stockholders cash for their stock, or to buy Crown's assets for cash, A stockholders would have voted share for share alike with B stockholders. A's voting superiority would have prevented a merger or sale of assets giving grossly disproportionate proceeds to the B class, since either plan would require two-thirds approval of all stockholders. Even if the

---

1. Named as defendants, but only Beneficial was served.

total price had remained the same, the Class A stockholders would then have received about $1,670,000, and Class B, only $12,500, the book value of the stock at the time. But using their fiduciary positions, the Class B stockholders "shape[d] the transaction in such a way" that they were paid about $700,000 for their shares, plus some $200,000 in benefits under employment and consulting agreements. Class A stockholders were paid only $800,000 for their stock, $870,000 less than they should have received. Moreover, but for the fraudulent scheme, Beneficial would have had to pay more than mere book net worth. Beneficial's motive in the conspiracy was to keep the cost of the acquisition down by overpaying the B's and underpaying the A's; Beneficial received at least $300,000 in tangible assets and $500,000 worth of going business value without paying for them.

In sum, in the words of the district judge, "the alleged fraudulent scheme involved three steps: (1) a purchase by Beneficial of the Class B stock from the directors of Crown; (2) a public offer or tender by Beneficial to the holders of the Class A stock to acquire 95% of the total outstanding shares of Crown; and (3) a short form merger of Crown into a wholly-owned New York subsidiary of Beneficial which would result in the acquisition of the remaining shares of Class A stock." Thus, the complaint alleges that in early August 1963, Beneficial agreed with the principal B stockholders to buy their 43,000 shares at $15.00 a share, and later that month made a public offer to A stockholders to purchase A shares for $1.25 a share. This was increased to $2.50 in an offer sent out to remaining A holders in January 1965. Some A holders accepted, not knowing the facts. By the fall of 1965, having acquired ninety-five per cent of the A stock, Beneficial was engaged in completing the merger of Crown into it on a basis which paid minority stockholders $3.29 in cash per share; since

this was a short form merger, the assent of the remaining A stockholders, like appellant Vine, was not necessary. The complaint further alleges that this overall scheme and the various acts and omissions pursuant thereto constituted fraud on the Class A stockholders and were violations of the Act and Rule 10b-5, and New York and Delaware law. The amended complaint seeks $1,700,000 in damages for Crown, plus what Crown's assets were worth in addition to what was paid for them, and punitive damages, all to be paid pro rata to A stockholders who did not participate in the claimed wrongdoing.

## II.

Beneficial moved in the district court to dismiss the amended complaint. Judge Bonsal found the federal claim insufficient on the ground that plaintiff was not a seller under the Act. As for the state law claim in which jurisdiction was based on diversity, the judge held that it could not stand on its own because the amount in controversy vis-a-vis appellant was less than $10,000. Moreover, the defect in jurisdictional amount could not be remedied by totalling the claims of all A stockholders because the class was a "spurious" one, and the derivative action failed because Crown no longer existed. Hence, the motion was granted and dismissal ordered on February 23, 1966. 252 F.Supp. 212 (S.D. N.Y.1966).

On March 3, the parties stipulated that a motion to reargue by plaintiff "shall be deemed to be timely made" if plaintiff delivered his motion papers and memorandum to appellee's attorneys by March 10 and made the motion returnable on March 22. Thereafter, on March 10, plaintiff noticed a motion for leave to reargue the dismissal of his amended complaint, and combined with it a motion for leave to file a second amended complaint.[2] On April 6, Judge Bonsal denied both motions in a memorandum opinion. CCH Fed.Sec.L.Rep. ¶ 91,663.

2. The substance of this complaint is discussed at p. 636 infra.

Appellant's notice of appeal from the order was filed a week later.[3]

■ Neither side expresses any doubt as to our jurisdiction and what has been brought up for review, although Beneficial's brief does correctly state that an order denying reargument is not appealable, In the Matter of Brendan Reilly Associates, Inc., 372 F.2d 235 (2d Cir. Jan. 30, 1967), and assumes that it is the judgment dismissing the first amended complaint that is being appealed from; both sides argue issues raised by the two amended complaints. Nevertheless, it is well settled that we must satisfy ourselves that we have jurisdiction even if a party does not raise the issue (at least where a substantial question of jurisdiction is apparent), e. g., Levin v. Ruby Trading Corp., 333 F.2d 592, 594 (2d Cir. 1964), and that timeliness is jurisdictional, Guido v. Ball, 367 F.2d 882 (2d Cir. 1966) *(per curiam)*. Here, the notice of appeal was not filed "30 days from the entry of the judgment" of dismissal of the first amended complaint, see Fed.R.Civ.P. 73(a), and, as indicated above, the denial of reargument is not appealable. However, the Supreme Court has construed words in its own Rule 11(2) similar to the quoted words to mean that time to appeal runs from the denial of a petition for rehearing by the court from whose judgment the appeal is taken, at least when the petition for rehearing was timely. United States v. Healy, 376 U.S. 75, 77–80, 84 S.Ct. 553, 11 L.Ed.2d 527 (1964). Moreover, Rule 73(a) itself provides that the thirty-day period for appeal starts anew after denial of a timely motion for a new trial, and by analogy a motion for reargument of a motion to dismiss should also again start the running of time for appeal. See 7 Moore, Federal Practice ¶ 73.09[4] at 3183–85 (2d ed. 1966); cf. Terrasi v. South Atl. Lines, Inc., 226 F.2d 823 (2d Cir. 1955), cert. denied, 350

U.S. 988, 76 S.Ct. 475, 100 L.Ed. 855 (1956). Therefore, Vine's notice of appeal was timely if his motion for reargument stopped the thirty days from running from February 23, the date of dismissal of his first amended complaint. Rule 9(m) of the General Rules for the Southern District required a motion for reargument to be made within ten days after the order dismissing the first amended complaint. Vine's motion was not made in that period because the parties had stipulated within the ten-day period that such a motion would be timely if made by March 10 (less than a week after the ten days expired). It is true that the stipulation was not signed by a judge,[4] but Judge Bonsal did receive and keep the motion *sub judice* some two weeks before deciding it on the merits, so that retroactive approval of the stipulation may be implied. As a result, the motion to reargue dismissal of the first amended complaint was not decided until after thirty days had run from the original order of February 23. Under these circumstances, we think that Vine could reasonably withhold his notice of appeal until the motion to reargue was decided. See Wolfsohn v. Hankin, 376 U.S. 203, 84 S.Ct. 699, 11 L.Ed.2d 636 (1964), reversing 116 U.S.App.D.C. 127, 321 F.2d 393 (D.C.Cir.1963); Thompson v. Immigration & Naturalization Serv., 375 U.S. 384, 84 S.Ct. 397, 11 L.Ed.2d 404 (1964). As to what was brought here for review, considering the manner in which the parties have so far proceeded, we are confident that both the February 23 and April 6 orders of Judge Bonsal are within our appellate purview. See Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

### III.

■ Turning to the merits, we consider first the amended complaint's federal claim under the Act and Rule; the

---

3. The notice was dated April 7, 1966, but was stamped "Filed" on April 13, 1966.

4. See Rule 12, General Rules of United States District Courts for the Southern and Eastern Districts of New York,

specifying which consent orders shall be signed by a clerk without submission to a judge; cf. Orange Theater Corp. v. Rayherstz Amusement Corp., 130 F.2d 185 (3d Cir. 1942).

factual allegations in the complaint must, of course, be taken as true, since judgment was granted on a motion to dismiss. The district court's narrow holding was that since Vine neither accepted the offer to purchase his stock nor surrendered his stock pursuant to the statutory short form merger, he was not a seller, and therefore there could have been no fraud as to him in connection with the purchase or sale of a security.

Section 10 of the Act, 15 U.S.C. § 78j, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b-5 of the Commission, 17 C.F.R. § 240.10b-5 (1964), provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

Although the complaint was properly characterized by the district judge as "diffuse," it does allege a "scheme \* \* \* to defraud" and a "course of business which \* \* \* would operate as a fraud" within subsections (a) and (c) of the Rule.[5] In this court, therefore, the narrow question is once again whether appellant is a seller, both parties assuming that Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), requires this status for him.[6] Appellee claims that Vine is not a seller; appellant argues that he is indeed a seller, albeit a forced one, as a result of the short form merger.

Appellant's position is controlled by the mechanics of a short form merger. It is unclear whether the merger was carried out under Delaware or New York law, but the respective statutes are similar enough. New York Business Corporation Law, McKinney's Consol. Laws, c. 4, § 905(a) authorizes a corporation owning at least ninety-five per cent of the outstanding shares of each class of another corporation to merge the latter corporation into the former without the authorization of the shareholders of the latter corporation, on approval of the board of the former corporation (see § 907(c) for foreign corporations). Under Delaware Code Ann. tit. 8, § 253(a) (Supp. 1964), the surviving corporation need only own ninety per cent of the subsidiary. The consent of the remaining five per cent (or ten per cent) stockholders is not required to effectuate a short form merger. However, such stockholders are given an opportunity to obtain the fair value of their shares, either by agreement with the corporation (presumably this is the source of the

---

5. A violation of subsection (b) is also alleged in general terms.

6. An alternative suggestion of *amicus* Securities and Exchange Commission ar-

gues for a broader reading of the law, discussed below.

$3.29 figure alleged by appellant) or by a judicial proceeding—the so-called "appraisal." See generally Israels, Corporate Practice 283–98 (1963); Note, Valuation of Dissenters' Stock Under Appraisal Statutes, 79 Harv.L.Rev. 1453 (1966).

■ Thus, once the conditions for a short form merger had been achieved, appellant's rights in his stock were frozen. He had and still has only the options of exchanging his stock for $3.29 a share, pursuant to appellee's offer, or pursuing his right of appraisal, which would also result in cash from appellee. Other than that, with one possible exception to be discussed below, appellant is left only with certificates of ownership in a non-existent corporation. Since, in order to realize any value for his stock, appellant must exchange the shares for money from appellee, as a practical matter appellant must eventually become a party to a "sale," as that term has always been used. See 1 Corbin, Contracts § 4 (1963). It is true that appellant still has his stock; if he turned it in for the price of $3.29 a share, it would be clearer that appellant is a seller. Assuming that this would not otherwise affect his right to sue under the Act and the Rule, requiring him to do so as a condition to suit seems a needless formality.

■ We do not construe the Act so narrowly. As noted above, section 10(b) of the Act applies to the "purchase or sale" of securities. Section 3 of the Act, 15 U.S.C. § 78c, provides:

(a) When used in this title, unless the context otherwise requires—

\* \* \* \* \* \*

(13) The terms "buy" and "purchase" each include any contract to buy, purchase, or otherwise acquire.

(14) The terms "sale" and "sell" each include any contract to sell or otherwise dispose of.

It has been pointed out that the verb "include," rather than the verb "means," emphasizes the breadth of this definition, see United States v. Robertson, 181 F. Supp. 158, 162 (S.D.N.Y.1959) (construing similar language in the Securities Act of 1933), and the phrases "or otherwise acquire" and "or otherwise dispose of" are hardly limiting. We do not have here a stockholder who refuses to accept a fraudulent offer to purchase his stock but remains a stockholder in an existing corporation; whether to label this hypothetical person a "seller" under the Rule is a much different question. Due to defendant's acts, Crown has now disappeared and plaintiff's stock has, in effect, been involuntarily converted into a claim for cash. The only case cited to us on all fours is Voege v. American Sumatra Tobacco Corp., 241 F.Supp. 369 (D. Del.1965), in which the court concluded, although on a different theory from the one adopted here, that a short form merger brought about a fraud related to a "sale" of plaintiff's stock, even though she still physically possessed it. But see Dasho v. Susquehanna Corp., 267 F.Supp. 508, N.D.Ill., June 28, 1966 (motion for rehearing), appeal pending, 7th Cir. We find no other case squarely in point, although Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964), and Hooper v. Mountain States Sec. Corp., 282 F.2d 195, 202–203 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961) ("otherwise dispose of"), both indicate receptivity on different facts to a broad construction of "sale" under the Act and Rule.[7] Although other cases are cited to us by appellees, none of them in fact is controlling.[8]

---

7. See also Polakoff v. Delaware Steeplechase & Race Ass'n, 254 F.Supp. 574 (D. Del.1966); Simon v. New Haven Board & Carton Co., 250 F.Supp. 297 (D.Conn. 1966); Eagle v. Horvath, 241 F.Supp. 341 (S.D.N.Y.1965); H. L. Green Co. v. Childree, 185 F.Supp. 95 (S.D.N.Y. 1960); Blau v. Hodgkinson, 100 F.Supp. 361 (S.D.N.Y.1951); Fleischer, "Federal

Corporation Law": An Assessment, 78 Harv.L.Rev. 1146, 1153 n. 37 (1965); 3 Loss, Securities Regulation 1469–71 (2d ed. 1961).

8. E. g., there was no deception in O'Neill v. Maytag, 339 F.2d 764 (2d Cir. 1964); in Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S.

Under the particular circumstances of this case, we hold that appellant is a seller under the Act. Moreover the converse is, therefore, true; Beneficial, if the allegations of the complaint are accepted, is a purchaser of plaintiff's stock through its agent and wholly-owned subsidiary Beneficial Finance Company of New York, Inc. [The *amicus* brief points out that the fraud alleged here is properly regarded as in connection with the purchase of the Class A stock, rather than a sale, since the wrongdoing emanates from the purchaser. We accept this characterization and note that it does not change the substance of the legal right involved.]

Appellee vigorously contends that appellant cannot be a defrauded seller because nothing was asked of him, no representations were made to him—indeed, under the merger statute, nothing had to be communicated to him but notice of his right to the offered $3.29 or to demand an appraisal. But it is precisely because appellee gives no choice to Vine under the statute and the latter must now exchange his shares for cash that appellant can now be deemed a seller. But appellee says, assuming that conclusion of the merger makes appellant a seller, any deception was in connection with the earlier stock acquisition from the ninety or ninety-five per cent of A stockholders, and that deception did not relate to appellant, who did not sell at that time. This ignores the simple fact that appellant would never be in the position of a forced seller were it not for the fraud. In essence, because of the distinctive nature of the short form merger procedure, appellee by deceiving A can cause B to become a seller. (When this is all part of a single fraudulent scheme and that scheme is a classic example of deception of an entire class of Class A public stockholders, as alleged here, we think the

policies of section 10(b) and Rule 10b-5 justify holding that fraud on A is "in connection with" the forced sale by B.] Appellee's point really is that reliance is a requirement in a Rule 10b-5 action and that appellant could not have relied on any deception because no representation was made to him. The need for such reliance by a plaintiff has been the subject of much recent scholarly analysis. See, e. g., Painter, Insider Information: Growing Pains for the Development of Federal Corporation Law Under Rule 10b-5, 65 Colum.L.Rev. 1361, 1366–1372 (1965); Note, Civil Liability Under Section 10b and Rule 10b-5: A Suggestion for Replacing the Doctrine of Privity, 74 Yale L.J. 658, 667–674 (1965). Whatever need there may be to show reliance in other situations, see List v. Fashion Park, Inc., 340 F.2d 457, 462–464 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); Rogen v. Ilikon Corp., 361 F.2d 260, 266–268 (1st Cir. 1966), we regard it as unnecessary in the limited instance when no volitional act is required and the result of a forced sale is exactly that intended by the wrongdoer. [Since the complaint alleges that plaintiff, in effect, has been forced to divest himself of his stock and this is what defendants conspired to do, reliance by plaintiff on the claimed deception need not be shown. What must be shown is that there was deception which misled Class A stockholders and that this was in fact the cause of plaintiff's claimed injury. The allegations of this complaint meet that test.]

The district court pointed out that the New York statutory scheme for short form mergers preserves appellant's right to challenge the legality of the merger.[9] N. Y. Business Corporation Law § 623(k). Appellee claims this to be a misreading of the law; however, we need not tarry over this for we do not

---

956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), plaintiffs had not sold their stock and were not being forced to; Barnett v. Anaconda Co., 238 F.Supp. 766 (S.D.N.Y. 1965), involved lack of causality between the deception and the injury.

9. This is the possible exception to the description of appellant's rights referred to at p. 634 supra; appellee does not agree with the district court in this respect, arguing that "a short form merger in its nature cannot be attacked by a minority stockholder as fraudulent."

regard the existence of a state remedy as negating the federal right. See J. I. Case Co. v. Borak, 377 U.S. 426, 433–435, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Appellee also points out that the *amicus* Securities and Exchange Commission has previously advocated that mergers do not result in sales of stock by dissenters.[10] We note that whatever stance it adopted two decades ago, the Commission strongly urges in this case that the short form merger resulted in a purchase and sale of plaintiff's stock within the meaning of Rule 10b-5.[11] Indeed, the Commission advances the alternative argument that plaintiff need not even be a selling stockholder to sue under 10b-5, so long as the Rule has been violated and plaintiff's stock lost value as a result. The Commission claims in effect that prior decisions in this circuit,[12] often cited for the rule that only a seller or purchaser may bring a Rule 10b-5 action, have been too broadly read and can be distinguished, see Leech, Transactions in Corporate Control, 104 U.Pa.L.Rev. 725, 832–835 (1956). In view of our disposition of this case, it is unnecessary to deal with this interesting contention. Finally, appellee argues that appellant can show no injury because the complaint alleges that the interest of the 624,870 outstanding shares of Class A stock amounted to $1,670,000 or $2.67 a share, while nonselling A stockholders were offered a minimum of $3.29 a share. However, the damages alleged to A stockholders do not rest solely on the $1,670,000 figure, but also include the sum of $800,000;

this amounts not to less than $3.29 per A share, but to more.[13]

## IV.

As indicated above, plaintiff also appeals from denial of his motion for leave to file a second amended complaint. That complaint extends the beginning of the fraudulent scheme back to 1950; it claims that when plaintiff bought his A stock, he was a defrauded buyer, because he and others were misled into buying a de facto subsidiary of Beneficial instead of an independent company, and that the new information in support of this claim was not discovered until just before the second amended complaint was filed. Thus, the second amended complaint presents another Rule 10b-5 theory: that plaintiff was a defrauded purchaser when he acquired his one hundred shares of Crown stock in 1962,[14] as well as a defrauded seller in 1963–1965, when the scheme to execute a short form merger was consummated. Judge Bonsal apparently denied leave to file this complaint on alternative grounds: (1) The new information alleged in the complaint was within plaintiff's knowledge before argument of the motion to dismiss the first amended complaint; (2) the amendment is insufficient as a matter of law, since Beneficial's consideration of future acquisition of Crown at the time of plaintiff's purchase of stock was not a material fact which had to be disclosed to plaintiff, and no damage was caused plaintiff by the failure to disclose that intention.

---

10. Reference is made to an *amicus* brief of the Commission in National Supply Co. v. Leland Stanford Junior University, 134 F.2d 689 (9th Cir.), cert. denied, 320 U.S. 773, 64 S.Ct. 77, 88 L.Ed. 462 (1943), which construed the Securities Act of 1933.

11. Moreover, in SEC v. National Sec., Inc., 252 F.Supp. 623 (D.Ariz.1966), the Commission attacked a consolidation and reorganization under Rule 10b-5.

12. Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952); O'Neill v. Maytag, 339 F.2d 764 (2d

Cir.1964); List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

13. It should also be pointed out that if appellant states a federal claim—as we hold he does—he also purports to represent those selling A stockholders who accepted the $1.25 per share public offer of August 1963, or the $2.50 public offer of January 1965, all of whom may have been injured, if the allegations of the complaint are true.

14. The briefs assume that this is the date, although the proposed second amended complaint does not so allege.

█ Thus, one basis for denial of leave to amend was the bad faith of appellant in waiting to see how he would fare on the prior motion to dismiss. Although "leave shall be freely given when justice so requires," Fed.R.Civ.P. 15(a), in these circumstances it was certainly within the district court's discretion to deny leave to amend because of "undue delay, bad faith or dilatory motive." See Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Moreover, from all that appears from the allegations, the only damage suffered by plaintiff as a purchaser was the abstract deprivation of knowledge that Crown was a "de facto" subsidiary of appellee. This status may have increased the value of Crown stock; the second amended complaint does not allege how this concealment harmed him financially, apart from laying the groundwork for the alleged fraud in merging Crown with Beneficial. The latter, of course, merely restates the claim casting plaintiff as a forced seller for too little consideration. So long as that claim stands, alleging fraud on plaintiff as a purchaser in this case is not a distinctive ground for relief. Accordingly, Judge Bonsal's decision is in this respect affirmed.

## V.

█ Having determined that appellant has an individual federal claim under section 10(b) of the Act and the Rule, we turn to the problems posed by the jumbling together in the complaint of the derivative and class claims. Taking the former first, the district court held that plaintiff could not maintain an action on behalf of the now nonexistent corporation (Crown) under the Delaware law the court regarded as applicable. Appellant's attack on that conclusion raises a variety of formidable questions, such as whether New York or Delaware law controls in determining whether a

foreign corporation (Crown) survives for purposes of suing to redress state-created rights, and what the law in the respective jurisdictions actually is.[15] Fortunately, these problems need not be pursued for we see no reason why Crown and, therefore, its shareholders derivatively may sue, even assuming capacity of the defunct corporation. Appellant obviously does not wish to recover benefits which will accrue to holders of Crown's Class B stock, "virtually all" of whom he characterizes as part of a conspiracy to defraud. As for A holders, they can be protected through the class action. The corporation itself is no longer functioning for any purpose, so it is senseless to talk of benefits that will be derived from Crown by this litigation. Appellant suggests that if the whole controversy revolves around Crown as a nominal indispensable party (so that the corporation will receive papers in the litigation), Beneficial New York would do nicely in its place. The plausibility of this suggestion only serves to point up the meaninglessness of a derivative suit on behalf of Crown—a corporation which has been swallowed whole by the subsidiary of the defendant-wrongdoer. Compare Perlman v. Feldman, 219 F.2d 173, 50 A.L.R.2d 1134 (2d Cir.), cert. denied, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955), where recovery went to shareholders, instead of the corporation in whose right the action was brought.

█ Turning to the action allegedly on behalf of all Class A stockholders, the district court considered only its effect upon jurisdiction, since dismissal of the federal claim required diversity and jurisdictional amount for the state law claim. In view of our reinstatement of the federal claim, this aspect of any class action becomes unimportant since jurisdiction is pendent to the federal claim. Other questions affecting the class action

15. Whether the ultimate question is simply one of capacity to sue, see Fed.R.Civ.P. 17(b); cf. N. Y. Business Corporation Law § 1306, or of capacity plus what particular substantive rights run to a merged corporation, see N. Y. Business Corporation Law § 906(b) (3); Beloff v. Consolidated Edison Co., 300 N.Y. 11, 87 N.E. 2d 561 (1949); Braasch v. Goldschmidt, 199 A.2d 760 (Del.Ch.1964), is itself one of no little difficulty.

should be passed upon in the first instance by the district court judge under Fed.R.Civ.P. 23.

The district court order dated February 23, 1966, dismissing the first amended complaint is reversed except insofar as it dismisses the derivative action; the order dated April 6, 1966, is affirmed insofar as it denies leave to file a second amended complaint. The case is remanded for further proceedings consistent with this opinion.