**David P. HOULIHAN et al., Plaintiffs,**

v.

**ANDERSON–STOKES, INC., et al., Defendants.**

**Civ. A. No. 75–0555.**

United States District Court,
District of Columbia.

July 20, 1977.

Lionel E. Pashkoff, Washington, D. C., Alan I. Baron, Baltimore, Md., for defendants Interim Mortgage Co., Chase Manhattan Mortgage Realty and Trust Co., Virginia Mortgage and Inv. Co., Louis Russell, and Lela Constance Russell.

John E. Vanderstar, Richard L. Dashefsky, Washington, D. C., for defendant R. S. Noonan, Inc.

Henry A. Berliner, Jr., Washington, D. C., for defendants Phyllis W. Stokes and Margot W. Anderson.

James Hamilton, Martha Jane Shay, Michael I. Sanders, Philip L. Cohan, Washington, D. C., for plaintiffs.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

This case is before the Court on a motion to dismiss filed by defendants Interim Mortgage Company, Chase Manhattan Mortgage Realty and Trust Company, Virginia Mortgage and Investment Company, Louis Russell, and Lela Constance Russell (hereinafter, "the construction lenders"). Defendant R. S. Noonan, Inc. and defendants Phyllis W. Stokes and Margot W. Anderson have also filed motions to dismiss or, in the alternative, for summary judgment. These latter motions raise, *inter alia,* issues related to the motion filed by the construction lenders; to the extent that the latter motions overlap with the former, they will be treated together in this Memorandum Opinion. The Court has issued separate memoranda and orders this date disposing of those portions of the latter motions which do not overlap with the motion to dismiss filed by the construction lenders. The background section set forth below applies to all aspects of the three motions mentioned above; it has been incorporated by reference in the memoranda dealing with those aspects of the latter motions not covered in this opinion.

For the reasons which follow, the Court will deny the construction lenders' motion to dismiss and, for the same reasons, those portions of the latter motions which raise related issues.

### I. *BACKGROUND*

Plaintiffs' allegations present this case in two phases. The first phase concerns the sale to plaintiffs in 1972 of certain limited partnership units of a Maryland limited partnership, known as 9400 Ocean Highway Associates, formed for the construction and

sale of a high-rise condominium building in Ocean City, Maryland. Plaintiffs allege that various defendants in this case (not involved in the motions presently under consideration) violated federal and local securities law statutes and also incurred common law liability as a result of the sale to plaintiffs of the limited partnership units in question. A series of motions concerning this first phase of the case have been decided by the Court. *See* opinions and accompanying orders herein of May 11, 1977 and June 28, 1977.

The motions presently under consideration all concern the second phase of the case; accordingly, the Court finds it appropriate to set forth at the outset a summary of the allegations which constitute the second phase. The Court stresses that the summary which follows is merely plaintiffs' version of the events crucial to this case; by setting them forth, the Court, of course, expresses no opinion as to their accuracy.

According to the plaintiffs, each limited partner invested $44,000 per partnership unit when the units were sold to them in 1972. The rights, duties, and obligations of the general and limited partners, in addition to some of the benefits which were to inure to the limited partners, were set forth in the Offering Memorandum and the Partnership Agreement among the parties. For purposes of this case, six facts allegedly established by those documents are crucial: (1) the general partners contributed to the partnership all of their right, title, and interest in the land and its improvements in exchange for contribution of capital by the limited partners; (2) in the event the limited partners did not regain their original investment by June 30, 1974, the general partners committed themselves to taking one of three steps, including foregoing all of their collective interests in the condominium; (3) the general partners agreed to obtain prior approval of at least 60 per cent of the total partnership interests (which were held, under the Partnership Agreement, entirely by the limited partners[1])

before selling in bulk all or any substantial part of the land or improvements; (4) the general partners agreed to contribute whatever amounts were necessary above scheduled costs to complete the development, construction, and marketing of the partnership's property; (5) individual defendants Messrs. Stokes, Anderson, Mack, Butler, and Carpenter and their spouses personally guaranteed the construction loan for the project; (6) the limited partners were to receive income from the sales of condominium apartments as well as from ground leases which were to be created on the units and assigned to the limited partners as the units were sold.

In the two years following the formation of the partnership, the condominium project encountered serious construction and financial difficulties. According to the plaintiffs, the limited partners were not provided with substantial information concerning these difficulties until a meeting on June 28, 1974. A series of meetings and negotiations concerning the future status of the project were begun in the summer of 1974, with representatives of the general and limited partners, the construction lenders, and the holder of the purchase money mortgage on the land, among others, participating.

On June 30, 1974, the limited partners had received no return on their original investment. Accordingly, pursuant to the Partnership Agreement, the general partners resigned their collective interests in the building, leaving the limited partners as the sole parties entitled to income from the project.

In August 1974, defendant R. S. Noonan, Inc., the general contractor on the building, filed a mechanics lien for monies due on the building. The general partners subsequently filed a counterclaim on behalf of the partnership for over $3.4 million in damages resulting from alleged delays in construction on the part of the contractor.

From October 1974 on, the limited partners were, they allege, excluded from further negotiations on the future of the fi-

---

1. The general partners had rights to specified portions of profit but were not assigned a percentage of partnership interest.

nancing and construction of the project. In January 1975, according to plaintiffs, a settlement agreement regarding the project was reached among the construction lenders, the contractor, the general partners, and Messrs. Anderson, Stokes, Butler, Mack, and Carpenter and their spouses. In preparation for this agreement, the general partners had executed in December 1974 a quitclaim deed for consideration of one dollar which purported to convey the partnership's land and building to the general partners as joint venturers. Under the terms of the settlement, the general partners proceeded to convey portions of the partnership property to the construction lenders; the holder of the purchase money mortgage; Mr. and Mrs. Anderson; Anderson-Stokes, Inc., a general partner; and R. S. Noonan, Inc., the general contractor. With some of these conveyances, the ground leases were extinguished upon transfer and the partnership units were conveyed in fee; with others, the units were conveyed subject to ground leases which were transferred to the construction lenders. The lenders released at least the Stokes and the Andersons—and perhaps the Butlers, the Macks, and the Carpenters—from their personal guarantees on the construction loans. General partners Anderson-Stokes, Inc., and Real Equity Investments, Inc., obtained releases from similar guarantees. At the same time, the general partners settled the claim made on behalf of the partnership against the contractor, R. S. Noonan, Inc., for a small fraction of the $3.4 million claim.

Plaintiffs allege that they were not informed of the settlement agreement until February 1975. Under the terms of that agreement, the limited partners were given the right, under certain conditions, to purchase condominium units. Finding the conditions unacceptable, all of the limited partners declined to purchase units. Under the

settlement agreement, the limited partners now have what they regard as a remote and improbable right to receive payments only if the construction lenders obtain funds in excess of those needed to satisfy the construction mortgage, any mortgages granted pursuant to the settlement agreement, and related expenses. To receive such payments, the limited partners would have to sign a release of all of their claims concerning the project.

In Count XIII of the Third Amended Complaint, plaintiffs allege that, in light of the claims summarized above, various defendants (including all of the defendants whose motions are considered in this opinion) participated in a common scheme and conspiracy to liquidate all or substantially all of the assets of the partnership in violation of the rights and interests of the limited partners, as set forth in, *inter alia,* the Partnership Agreement. Claiming that this "forced disposition" of plaintiffs' assets constituted a "sale" by plaintiffs within the meaning of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, plaintiffs seek damages for defendants' alleged violations of those provisions as well as for common-law fraud.[2]

In Count XIV, plaintiffs allege that various defendants (including all of the moving defendants except Mrs. Stokes and Mrs. Anderson) conspired with the general partners in an unlawful conversion of plaintiffs' interests in the partnership assets to the defendants' own uses and interests.

The Court stresses again that by setting forth this lengthy summary of the plaintiffs' allegations it expresses no opinion whatsoever as to their accuracy. Because the alleged factual pattern set forth above forms the background for all of the motions presently under consideration, the Court found it necessary to set forth the allega-

---

**2.** Plaintiffs also charge defendants with violations of § 20 of the Securities Exchange Act, 15 U.S.C. § 78t. Section 20, which is not discussed in any of the motions papers, holds "controlling persons" liable for violations of other sections of the Act by those whom they control. Obviously, the viability of plaintiffs'

§ 20 claim turns on the viability of the principal claim under § 10(b).

Upon filing the Third Amended Complaint, plaintiffs also raised a claim in Count XIII under § 17 of the Act, 15 U.S.C. § 77q, but plaintiffs have since conceded that claim.

tions in some detail. The Court now turns to the specifics of the motions.

## II. *DEFENDANTS' MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER § 10(b) AND RULE 10b–5 UPON WHICH RELIEF CAN BE GRANTED MUST BE DENIED*

The construction lenders have filed a motion to dismiss Count XIII for plaintiffs' failure to state a claim upon which relief can be granted. Defendant Noonan has joined in that motion and has raised additional related issues in its own motion to dismiss. Defendants Anderson and Stokes have not joined in the other defendants' motions to dismiss, but their motion to dismiss raises, *inter alia*, related issues.

### A. *The Complaint Charges Defendants With Violations Of Obligations Chargeable Under § 10(b) And Rule 10b–5.*

■ In a somewhat general and unfocused fashion, the construction lenders have claimed, and defendant Noonan has joined in the claim, that plaintiffs' complaint alleges a breach of duties which are "not chargeable" under § 10(b) and Rule 10b–5.[3] The Court disagrees.

The central premise of defendants' objection seems to be that plaintiffs have alleged a type of activity on the defendants' part that should be handled in the state courts and not in the federal courts under § 10(b). Defendants rely heavily on *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.),

*cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), in which the court held that § 10(b) was not directed at activity that amounted to "fraudulent mismanagement of corporate affairs," but was instead intended to cover only "that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities." *Id.* at 464. The major problem with defendants' approach, as explained below, is that even in the circuit in which it arose, *Birnbaum* is now discredited authority on the point for which it is cited by plaintiffs. The current state of the law is defined by the Supreme Court's decision in *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

In *Bankers Life,* the petitioner Superintendent alleged that various individual respondents conspired to defraud a casualty company by acquiring it with its own assets. Petitioner alleged that respondent Bankers' Life sold all of the casualty company's stock to the individuals involved for $5 million. The individuals paid the purchase price with a check from another bank, even though they had no funds on deposit at that bank when the sale was made. Upon acquiring the casualty company, the individuals sold the company's Treasury bonds for $4.8+ million. That amount, plus enough cash to bring the total to $5 million, was transferred to an account in the company's name at the bank from which the individuals had obtained the $5 million check, and the check was charged

---

**3.** Section 10 provides in relevant part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> .    .    .    .    .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5, 17 CFR § 240.10b–5, provides:
> Employment of manipulative and deceptive devices.

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

against the company's account. As a result, the individuals had managed to purchase the company's stock with the company's assets.

Suit was brought under, *inter alia,* § 10(b). The district court dismissed the case and the court of appeals affirmed. The Supreme Court reversed finding that a cause of action had been charged under § 10(b):

> [W]e do not read § 10(b) as narrowly as the Court of Appeals; it is not "limited to preserving the integrity of the securities markets" . . . though that purpose is included. Section 10(b) must be read flexibly, not technically and restrictively. Since there was a "sale" of a security and since fraud was used "in connection with" it, there is redress under § 10(b), whatever might be available as a remedy under state law.

> We agree that Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement. But we read § 10(b) to mean that Congress meant to bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face to face. . . .

> The crux of the present case is that [the casualty company] suffered an injury as a result of deceptive practices touching its sale of securities as an investor.

404 U.S. at 12–13, 92 S.Ct. at 169.

*Bankers Life* effectively overruled the *Birnbaum* rule. As the Second Circuit itself wrote:

> As long ago as *A.T. Brod & Co. v. Perlow,* 375 F.2d 393, 397 (2d Cir. 1967), [the] *Birnbaum* proposition was no longer the law of this circuit as 10b–5 was there construed to include "*all* fraudulent schemes in connection with the purchase or sale of securities, whether . . . a garden type variety of fraud, or . . . a unique form of deception." . . .
> Thus Judge Feinberg could write in *Popkin v. Bishop,* 464 F.2d 714, 718 (2d Cir. 1972), that "assertions by a defendant that the misconduct complained of 'really' amounts to 'just' corporate mismanage-

ment will not cut off a plaintiff's federal remedy. Where Rule 10b–5 properly extends, it will be applied regardless of any cause of action that may exist under state law." In any event, any lingering doubts as to the vitality of this *Birnbaum* proposition were firmly interred by the Supreme Court in *[Bankers Life]* . . . when the Court stated that it is not "sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is 'usually associated with the sale or purchase of securities'" [*quoting A.T. Brod & Co. v. Perlow,* 375 F.2d at 397] and that

> [t]he fact that the fraud was perpetrated by an officer of [the company] and his outside collaborators is irrelevant to our problem. . . .

*Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 379–80 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). *See Bailey v. Meister Brau, Inc.,* 535 F.2d 982, 994 (7th Cir. 1976).

Applying this wealth of post-*Birnbaum* law to the instant case, it is clearly insufficient for defendants to claim that this case really amounts to allegations of "mere" corporate mismanagement which ought to be handled in the state courts. The corporate mismanagement alleged here, as in *Bankers Life,* involves deceptive practices "touching" the sale of securities, to wit, an illegal "forced sale" of plaintiffs' securities in exchange for which plaintiffs received nothing of value. In fact, these alleged practices more than "touch" the sale of securities; the "forced sale" was at the heart of the alleged scheme. To find in these circumstances that plaintiffs have not alleged a breach of duties "chargeable" under § 10(b) would be to significantly weaken that provision. As the Third Circuit Court of Appeals wrote in *Landy v. FDIC,* 486 F.2d 139 (1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974):

> Although the immediate legislative focus [of § 10(b)] was to safeguard the informational atmosphere in the securities market from deceptive devices and enervating impurities, it must be acknowledged that the broader focus of the Securities Exchange Act was on protecting

the investor and making the market place safe to trade. Equally disastrous to the investor would be *schemes not involving misinformation* but, nonetheless, directly related to the trading process, *artifices leaving the investor with less than he bargained for.* Thus, casting *the seller who has parted with his securities but has been cheated of payment* —as occurred in *Bankers Life* —to the vagaries of state law, the problems of state jurisdiction and service of process, would ill serve basic congressional policy.

*Id.* at 157–58 (emphasis added).[4]

*B. Plaintiffs Have Stated a Claim Under § 10(b) And Rule 10b–5 For "Secondary Liability" Against The Construction Lenders.*

In an objection somewhat similar to the one discussed in the immediately preceding section, the construction lenders have claimed that plaintiffs have failed to charge defendants with "secondary liability" cognizable under § 10(b). It is somewhat difficult to discern exactly what defendants mean by the term "secondary liability," but it is nevertheless clear that the construction lenders are properly within the reach of plaintiffs' § 10(b) allegations.

Defendants make two basic points in support of their position. In the first, defendants claim that the nature of a limited partnership in Maryland is such that they had no choice but to deal with the general partners only; thus, they cannot be blamed for looking to the general partners for representation of the partnership. The Court has but two brief comments on this point. First, the issue of why the lenders dealt with some partners and not with others would seem to be a question of fact, which cannot be resolved on this motion to dismiss under Fed.R.Civ.P. 12(b)(6). In any case, the relevance of the point is not at all clear to the Court: As detailed in § I, *supra,* plaintiffs' allegations go far beyond the lenders' mere failure to deal with the limited partners; specifically, defendants are charged with participation in a conspiracy to strip the partnership of its assets in an unlawful manner.

The second point made by defendants is that since there was no direct fiduciary relationship between plaintiffs and the lenders, liability can only arise through some sort of secondary liability connected with an alleged conspiracy to violate the securities laws. Defendants add, however, that such liability cannot be premised on "mere inaction," and that they are accused of no more than that in plaintiffs' complaint. Defendants then cite the following passage from *Woodward v. Metro Bank,* 522 F.2d 84, 97 (5th Cir. 1975):

Thus, before someone can be caught within the net of aiding and abetting liability under Rule 10b–5, another party must have violated the securities laws, the alleged aider-abettor must be generally aware of his role in improper activity, and he must knowingly render substantial assistance.

This citation is most puzzling to the Court, for the portion quoted above seems to serve as a fair and accurate summary of plaintiffs' allegations! Certainly, plaintiffs have alleged that "another party" violated the securities laws; certainly, plaintiffs have alleged that the lenders the alleged aiders-

4. Defendants have cited the recent Supreme Court cases of *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), and *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), in further support of this aspect of their motion. Both of these cases are inapposite to the instant controversy. The central holding of *Ernst & Ernst* is that an allegation of negligent conduct is not sufficient to state a cause of action under § 10(b) and Rule 10b–5. In light of the fact that plaintiffs clearly charge these defendants with knowing participation in a scheme to defraud them, *Hochfelder* offers no support for the moving defendants.

In *Santa Fe,* the Court elaborated further on *Hochfelder,* holding that § 10(b) and Rule 10b–5 extend only to conduct involving manipulation or deception and finding that the allegations there at issue could not fairly be read as charging defendants with manipulative or deceptive practices within the meaning of § 10(b) and Rule 10b–5. In the instant case, there is no doubt that defendants are charged with widespread deceptive practices; *Santa Fe* therefore offers no support for the moving defendants.

The Court has also reviewed all of the other cases cited by defendants and finds it sufficient to note simply that they are all inapposite to the case at bar.

abettors, were generally aware of their role; and certainly, plaintiffs have alleged that the lenders rendered substantial assistance to the conspiracy: In alleging that the lenders engaged in a "device, scheme, or artifice to defraud" by accepting partnership property in the January 1975 settlement while knowing that the property was not the general partners' to convey, plaintiffs have clearly met the *Woodward* test as set forth above. The Court therefore rejects the lenders' contentions to the contrary.

*C. Plaintiffs Are Sellers of Securities And Can Therefore Maintain This Action Under § 10(b) And Rule 10b–5.*

■ As detailed by the Court in § IIA, *supra,* the case of *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), is in part discredited authority. However, in addition to the holding discussed *supra,* the *Birnbaum* court also held that in order to maintain an action under § 10(b) and Rule 10b–5, a plaintiff must be a purchaser or seller of securities. This portion of *Birnbaum* was explicitly adopted by the Supreme Court in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). In the instant case, the construction lenders, defendant Noonan, and defendants Stokes and Anderson have all claimed that plaintiffs are not "sellers" of securities; therefore, defendants conclude, plaintiffs cannot maintain this action.

As the Supreme Court noted in *Blue Chip Stamps,* "the *Birnbaum* rule has been flexibly interpreted by lower federal courts." *Id.* at 751, 95 S.Ct. at 1933. One result of this flexibility has been the development of the "forced seller" doctrine, as announced originally in *Vine v. Beneficial Finance Co.,* 374 F.2d 627 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967). In *Vine,* plaintiff owned 100 shares of Class A common stock of Crown Finance Co. The officers and directors of Crown were its principal Class B stockholders. Defendant Beneficial arranged for the merger of Crown into Beneficial, in a manner which, according to plaintiff, defrauded the Class A stockholders: It was alleged that Beneficial, acting in concert with the officers and directors of Crown, first purchased the Class B stock for an inflated price; next made a public offer to the unwitting Class A stockholders in order to acquire 95 per cent of the outstanding shares of Crown; and, having acquired 95 per cent of the outstanding shares, was then able, under applicable law, to execute a short form merger of Crown into a wholly-owned subsidiary of Beneficial, without the assent of the remaining Class A stockholders. Vine sued under § 10(b). The district court dismissed, holding that since Vine had not accepted Beneficial's offer to purchase his stock nor surrendered his stock pursuant to the statutory short form merger, he was not a seller and thus could not maintain an action under § 10(b). The court of appeals reversed. Observing that "Crown has now disappeared and plaintiff's stock has, in effect, been involuntarily converted into a claim for cash," the court held:

> Since, in order to realize any value for his stock, appellant must exchange the shares for money from appellee, as a practical matter appellant must eventually become a party to a "sale," as that term has always been used.

374 F.2d at 634. As the Fifth Circuit Court of Appeals noted in elaborating upon this "forced sale" doctrine:

> *Vine's* informing principle . . . is that a shareholder should be treated as a seller when the nature of his investment has been fundamentally changed from an interest in a going enterprise into a right solely to a payment of money for his shares.

*Dudley v. Southeastern Factor and Finance Corp.,* 446 F.2d 303, 307, *cert. denied,* 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971). *See Coffee v. Permian Corp.,* 434 F.2d 383 (5th Cir. 1970); *Crane Co. v. Westinghouse Air Brake Co.,* 419 F.2d 787 (2d Cir. 1969), *cert. denied,* 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970).

Applying the principles of these "forced sale" cases to the instant case, it seems clear that plaintiffs have made allegations that fall within the scope of the doctrine. As is obvious from the background section,

1338

*supra,* plaintiffs allege that the allegedly fraudulent disposition of their partnership assets transformed their securities from an interest "in a functioning enterprise into a right, albeit remote, to receive a payment of money." Third Amended Complaint, ¶ 116.

Defendants have put forward a variety of claims, however, why plaintiffs' allegations fail to fit within the "forced sale" doctrine. First, defendants point to what they regard as an apparent inconsistency in plaintiffs' complaint: if they are in fact "sellers" of securities, how can they at the same time tender their limited partnership interests to certain defendants. Defendants add that in *Vine* and *Coffee,* the plaintiffs were forced to dispose of their securities at some certain point, while that is not the case in this dispute. In response, plaintiffs explain that their decision to tender back to certain defendants their limited partnership units is merely a form of alternative pleading: They are claiming that they now hold certificates in a non-functioning entity, but they tender the certificates for whatever value they may have. Certainly, plaintiffs should not be penalized for creative pleading. As to the defendants' claim that a plaintiff must dispose of his securities at some point in order to be a forced seller, the cases cited by defendants support an opposite conclusion. For example, the *Vine* court recognized that plaintiff still held his certificates of ownership and had an option of exchanging his stock for an allegedly under-valued price. The court concluded that "requiring him to do so as a condition to suit seems a needless formality." 374 F.2d at 634.

Citing *In Re Penn Central Securities Litigation,* 494 F.2d 528 (3d Cir. 1974), and *Sargent v. Genesco, Inc.,* 492 F.2d 750 (5th Cir. 1974), defendants also contend that a mere diminution of the value of securities does not provide the holder with the status of a forced seller for purposes of suit under § 10(b). In connection with this claim, defendants presumably assert (although it is not clear) that the transaction in question constituted at most a mere diminution of plaintiffs' assets, no more. The short answer to this contention is that defendants have raised matters not proper for resolution on a motion to dismiss. If defendants can prove that the transaction amounted to a mere diminution in the value of plaintiffs' securities, they may prevail. But, for now, it is abundantly clear that plaintiffs have *alleged* far more than a mere diminution of value; they have alleged that the fraudulent forced sale stripped the limited partnership of its assets and turned each plaintiff's investment from an interest in a going enterprise to a remote right to receive money.

In a similar vein, defendants contend that the nature of plaintiffs' investments was not "fundamentally changed," as required by *Dudley,* since at the time of the alleged forced sale plaintiffs possessed mere interests in a non-functioning enterprise. Again, the defense might be valid, *if proved.* But on this motion to dismiss, the Court must simply look to the allegations of plaintiffs' complaint, and it is abundantly clear, as spelled out in detail in § IID, *infra,* that plaintiffs have alleged that the partnership was a going concern: Plaintiffs admit that the enterprise was in the midst of difficulties at the time of the alleged forced sale, but they point to such factors as the possibility of proceeds on foreclosure; the possibility of obtaining a judgment on the partnership's counterclaim against the contractor; the existence of personal guarantees of the construction loan; and the general partners' commitment to contribute sums in excess of scheduled costs to support their claim that the partnership was still viable. These allegations must, of course, be taken as true for the purposes of this motion to dismiss.

Defendant Noonan has tendered by far the most creative argument as to why the forced sale doctrine should not apply to this case. Noonan asserts that in all of the cases which apply the forced sale doctrine, it was initially expected that the enterprise in which the holders of the securities involved had invested would have continuing vitality; the forced sale doctrine was applied when those holders alleged that their expectations had been defeated by the fraudulent activities of the defendants. In this case, defendant claims, there was no

expectation that the enterprise would have any continuing vitality; its nature as a limited partnership which was formed to develop a single condominium project meant that the investors expected the enterprise to conclude its activities when its assets, the condominium units, were sold for cash. Without this expectation of continuity, defendant concludes the forced sale doctrine cannot be applied.

There are several reasons why defendant's contention is not convincing. First, it is factually incorrect: there was at least an element of expected continuity of the enterprise and the investment stemming from the planned creation of ground leases for the plaintiffs' benefit upon sale of the condominium units. But, more importantly, the existence of an expectation of continuity is ultimately irrelevant. There is nothing in any of the "forced sale" cases discussed in this section to indicate that the courts which decided those cases placed any significance whatsoever in the expected continuity of the enterprise in which the holders of the securities involved had invested. Moreover, defendant has not proffered any convincing rationale, much less authority, for its unique view of the forced sale doctrine. What is significant for purposes of this motion is plaintiffs' allegation that they had invested in an enterprise which was viable at the time of the transaction in question and that their investment was wrested from them and rendered worthless by the allegedly fraudulent activities of the defendants. That they may have expected the enterprise, and their securities, to be finite in nature, ending upon sale of the condominium units, is irrelevant; they certainly *never* expected that their securities would be disposed of and that the partnership would be terminated fraudulently and *prematurely,* before plaintiffs had an opportunity to earn a return on their investment. It seems that the best that defendant can legitimately claim is that at the time of the forced sale, there was no prospect of a return on the invest-

ment and that the general partners accordingly liquidated the enterprise lawfully in order to salvage as much as possible from the original investment. That is a viable claim, but, as the Court has indicated elsewhere in this opinion, it is a claim that cannot be resolved on this motion to dismiss.[5]

### D. Plaintiffs Have Alleged That They Have Suffered Damages Compensable Under § 10(b) And Rule 10b–5.

■ The construction lenders have claimed that plaintiffs have failed to allege damages compensable under § 10(b) and Rule 10b–5, and defendant Noonan has joined in that claim. Again, the Court disagrees.

Defendants correctly point out that under § 28(a) of the Act, 15 U.S.C. § 78bb(a), plaintiffs are limited to "actual damages." They claim further that at the time the settlement agreement in question was made, the lenders had the right, ultimately not exercised because of the settlement, to foreclose on the partnership's property. Thus, they conclude, no matter what the terms of the settlement were, the plaintiffs could not have been any worse off as a result of the settlement than if the lenders had simply foreclosed. Accordingly, defendants claim, plaintiffs have not alleged any "actual" damages compensable under the Act.

The problem with defendants' claim is that it asks the Court to make a determination of fact before trial, even before discovery, with no proper evidentiary record to serve as a basis for that finding. Plaintiffs point out that, if their allegations are taken as true (which, of course, they must be for purposes of a motion to dismiss), it is clear that plaintiffs would have been better off had the allegedly conspiratorial and unlawful settlement not taken place. For example, plaintiffs point out that foreclosure could have resulted in their receiving at least some of the resultant proceeds, whereas they were left with nothing as a result of

---

**5.** A portion of the motion to dismiss filed by defendants Stokes and Anderson raises issues related to those discussed in this section of the opinion. The only additional point these de-

fendants make is a claim that plaintiffs have failed to actually allege a sale of securities. In light of the above discussion, it is clear that defendants' contention is unsupportable.

the settlement; that if there had been no settlement, the partnership's $3.4 million counterclaim against defendant Noonan would have remained extant and might have resulted in a judgment of substantial proportions for plaintiffs; that absent the alleged conspiracy, the lenders might have forced the guarantors of the construction loan to meet their obligations, thus avoiding foreclosure; and that, similarly, the limited partners might have forced the general partners to fulfill their obligation, pursuant to the Partnership Agreement, to contribute sums needed for the project in excess of scheduled costs.

This is not to say that the scope of plaintiffs' damages is clear; further discovery may reveal that some of the possibilities listed above were in fact so remote as to render them useless as bases for measuring damages. However, all that the Court can say at this juncture is that the measure of damages is uncertain; such uncertainty is clearly no ground for dismissal.

### III. *CONCLUSION*

Plaintiffs have stated a claim under § 10(b) and Rule 10b–5 upon which relief can be granted. Accordingly, the motions to the contrary filed by construction lenders, defendant Noonan, and defendants Stokes and Anderson must be denied.[6] An order in accordance with this opinion will be issued this date.

### ORDER

In accordance with the Memorandum Opinion issued of even date herewith, it is, by the Court, this 20th day of July, 1977,

ORDERED, that the motion to dismiss filed by defendants Interim Mortgage Company, Chase Manhattan Mortgage Realty and Trust Company, Virginia Mortgage and Investment Company, Louis Russell, and Lela Constance Russell be, and the same hereby is, denied; and it is

FURTHER ORDERED, that the motion to dismiss filed by defendant R. S. Noonan, Inc., be, and the same hereby is, denied; and it is

FURTHER ORDERED, that, to the extent it raises issues related to the motions denied in the immediately preceding ORDERED paragraphs, the motion to dismiss filed by defendants Phyllis W. Stokes and Margot W. Anderson be, and the same hereby is, denied.

---

**6.** Defendant Noonan and the construction lenders have both urged the Court to decline from exercising pendent jurisdiction over the common law claims against them. The basis for their position is that the alleged federal law claims are either non-existent or tenuous at best. Since the Court finds in this opinion that the federal claims are viable, and because the exercise of the Court's pendent jurisdiction is therefore clearly appropriate, *see United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Court rejects defendants' claims with respect to pendent jurisdiction.