**Paul M. KIRWIN, et al. Plaintiffs,**

**v.**

**PRICE COMMUNICATIONS CORP., et al. Defendants.**

**No. CIV.A. CV 01–F–1201S.**

United States District Court,
M.D. Alabama,
Southern Division.

July 23, 2003.

G. Griffin Sikes, Jr., Montgomery, AL, John J. Oitzinger, Helena, MT, for Paul M. Kirwin, Cell–Cal T9, Joseph W. Carcione, Richard Erickson, George R. Gordon, M. Steven Grewal, Linda M. Hoff Partnership, Steven C. Meyer, Rajive Oberoi, Jonathan Stewart, Kenneth L. Ramsey, Harold W. Swart, plaintiffs.

Peter S. Fruin, Catherine Wolter Main, Maynard, Cooper & Gale, P.C., Montgomery, AL, G. Calvin Hayes, William F. Hamilton, Holland & Knight LLP, Tampa, FL, Richard L. Brusca, Skadden Arps Slate Meagher & Flom, LLP, Washington, DC, for Price Communications Corporation, Price Communications Cellular, Inc., Price Communications Cellular Holdings, Inc., Price Communications Wireless, Inc., Palmer Wireless Holdings, Inc., Cellular

Systems of Southeast Alabama, Inc., Robert Price, defendants.

## MEMORANDUM OPINION AND ORDER

FULLER, District Judge.

This case is before this court on the defendants' motion to dismiss plaintiffs' first amended complaint (doc. # 35, filed July 12, 2002). The defendants have filed a brief in support of this motion (doc. # 36, filed July 12, 2002), and the plaintiffs have filed a memorandum in opposition (doc. # 39, filed August 2, 2002), incorporating by reference large sections of their prior memorandum of law in opposition to defendants' motion to dismiss (doc. # 17, filed February 15, 2002), to which the defendants have responded (doc. # 40, filed August 12, 2002). Oral argument was held before Magistrate Judge Boyd on October 15, 2002. Because the case was reassigned afterwards, the court afforded the parties opportunity for further oral argument. At the request of the parties, the court instead permitted submission of supplemental authority (doc. # 51, entered June 19, 2003), which the court has now received and reviewed. After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court concludes that the defendants' motion is due to be GRANTED.

## I. PROCEDURAL HISTORY

The plaintiffs, twelve former minority shareholders[1] of Cellular Systems of Southeast Alabama, Inc. ("the Company"), bring this action against: (i) the Company; (ii) Palmer Wireless Holdings, Inc. ("Palmer Wireless"), the former majority shareholder of the Company; (iii) Price Communications Wireless, Inc. ("Price Wireless");

(iv) Price Communications Cellular Holdings, Inc. ("Price Holdings"); (v) Price Communications Cellular, Inc. ("Price Cellular"); (vi) Price Communications Corporation ("PCC"); and (vii) Robert Price ("Price"). The plaintiffs allege violations of the federal securities laws, RICO, and several state law causes of action. Two related fraudulent schemes were alleged: (i) that the defendants misappropriated Company assets and engaged in a pattern of self-dealing transactions while in control of the Company without telling the plaintiffs that they were doing so, and (ii) a separate fraud in connection with a short-form merger that eliminated the plaintiffs' minority interest in the Company.

The first round of this litigation began when the plaintiffs filed their complaint on October 11, 2001 (doc. # 1). The defendants filed a motion to dismiss and a brief in support of the motion on January 8, 2002. (docs. # 8 and # 9). The defendants argued that the federal causes of action should be dismissed under *Fed.R.Civ.P.* 12(b)(6) (failure to a state a claim) and under *Fed.R.Civ.P.* 9(b) (requiring heightened specificity for allegations of fraud). Moreover, the defendants argued that absent a viable federal cause of action, the court lacked supplemental jurisdiction to hear the state law claims. The plaintiffs filed a brief in opposition on February 15, 2002 (doc. # 17), to which the defendants responded on March 1, 2002 (doc. # 19). On March 6, 2002, this court ordered the plaintiffs to file an amended complaint by March 15, 2002 (doc. # 20, filed March 6, 2002). An amended complaint was deemed necessary to comply with the heightened pleading standards required for allegations of fraud. *See Fed.R.Civ.P.*

---

**1.** Plaintiffs include: (i) Paul M. Kirwin, (ii) Cell–Cal T9 (a partnership), (iii) Joseph W. Carcione, (iv) Richard Erickson, (v) George R. Gordon, (vi) M. Steven Grewal, (vii) Linda M. Hoff Partnership (a partnership), (viii) Steven C. Meyer, (ix) Rajive Oberoi, (x) Jonathan Stewart, (xi) Kenneth L. Ramsey, and (xii) Harold W. Swart.

9(b). On March 15, 2002, the plaintiffs filed a Motion for Reconsideration and/or Clarification of the Court's Order of March 6, 2002. (doc. # 21). On May 30, 2002, the court ordered the plaintiffs to file an amended complaint "on or before June 14, 2002, or risk dismissal of the Complaint" (doc. # 23, filed May 30, 2002), granting the plaintiffs' motion for clarification by elucidating what was defective in the original complaint. The chief defect was that:

> the court is unable to relate Plaintiffs' allegations of fraud to particular transactions. Some of the transactions obviously relate to the leveraged buyout, and some of the allegations obviously relate to the freeze-out merger, but Plaintiffs fail to delineate which allegations pertain to which transactions. If any of the alleged fraudulent acts of Defendants were not made *during* one of the transactions, then Plaintiffs need to specify how such fraud affected the transactions or otherwise violates federal law.... The Complaint needs to be specific as to what representations or omissions in that claim form the basis of Plaintiffs' federal securities fraud claims, and Plaintiffs need to explicitly delineate the precise representations or omissions in that claim, without incorporation by reference.

(doc. # 23). The plaintiffs subsequently made a motion to extend the deadline from June 14 to June 19, 2002, which the court granted. (docs.# 25, 28) This concluded the first round of litigation.

The second round of litigation began with the plaintiffs' submission of their first amended complaint on June 19, 2002 (doc. # 29). The defendants filed a motion to dismiss the first amended complaint, supported by a brief (docs. # 35–36, filed July 12, 2002) As in the first round of litigation, the defendants argued that the federal causes of action should be dismissed under *Fed.R.Civ.P.* 12(b)(6) (failure to a state a claim) and under *Fed.R.Civ.P.* 9(b) (requiring heightened specificity for allegations of fraud). Again, the defendants argued that absent a viable federal cause of action, the court lacked supplemental jurisdiction to hear the state law claims. The plaintiffs responded with a brief (doc. # 39, filed August 2, 2002), incorporating by reference large sections of their prior brief in opposition to the defendants' motion to dismiss (doc. # 17, filed February 15, 2002). The defendants responded on August 12, 2002 (doc. # 40). Oral argument was held before Magistrate Judge Boyd on October 15, 2002 (doc. # 42). The case was reassigned to the undersigned judge on December 5, 2002 (doc. # 43).

As stated above, the plaintiffs have alleged that the defendants have engaged in fraud in connection with a short-form merger eliminating the plaintiffs' minority interest in the Company. With respect to this charge, the plaintiffs have brought claims under the sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b), 78t(a)) and SEC Rule 10b–5 (17 C.F.R. § 240.10b–5) (counts 1 & 2), as well as a claim under common law fraud (count 5). The plaintiffs have also alleged that the defendants fraudulently concealed the fact that they were misappropriating Company assets and engaging in a pattern of self-dealing transactions while in control of the Company. These events occurred prior to the elimination of the plaintiffs' minority interest in the Company. Accordingly, the plaintiffs have brought claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964 (count 3), common law conversion (count 4), breach of fiduciary duty (count 6), and waste and mismanagement (count 7).

The remedies sought by the plaintiffs include rescission of the merger (count 8); imposition of a constructive trust to prevent unjust enrichment (count 9); punitive

damages for fraud (count 10); and reimbursement for reasonable attorneys fees and other costs including experts' fees (count 11), as well as an accounting of all benefits derived from misappropriation, damages, treble damages, and any further relief the court may deem appropriate.

## II. JURISDICTION

This court has federal question jurisdiction over alleged violations of the federal securities laws and regulations as well as RICO pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). Under 28 U.S.C. § 1367(a) the court may retain supplemental jurisdiction over related state law claims.

Plaintiff George R. Gordon is a resident of New York, and defendant Price Communications Corporation is a New York corporation (Am.Compl.¶¶ 27, 36). In these circumstances, diversity jurisdiction is not possible. Moreover, the plaintiffs do not allege the existence of diversity jurisdiction. Thus, the court lacks original jurisdiction over the state law claims.

## III. FACTUAL BACKGROUND

According to the amended complaint, Palmer Wireless, a Delaware corporation, acquired a majority interest in the Company, also a Delaware corporation, by transfer from a parent company in 1995 (Am. Compl.¶ 46). In 1997, PCC and Price (who was CEO and treasurer of PCC) decided to acquire Palmer Wireless, which already owned 92.3% of the Company's shares (Am.Compl.¶ 47). To do this, PCC formed Price Cellular, Price Holdings, and Price Wireless, all Delaware corporations with Price as chief executive officer (CEO). Price Wireless was a wholly-owned subsidiary of Price Holdings, which was a wholly-owned subsidiary of Price Cellular, which was a wholly-owned subsidiary of PCC (Am.Compl.¶¶ 37–41).

Price Wireless acquired Palmer Wireless in a leveraged buy-out (LBO). To finance the acquisition, PCC sold approximately $191 million in assets and borrowed approximately $857 million (Am. Compl.¶ 69), securing the debt with the target company's assets, including Company assets and the assets of Dothan Cellular, a wholly-owned subsidiary of the Company (Am.Compl.¶¶ 65, 145). Price became CEO of the Company and Dothan Cellular, and over the next several years the Company made low-interest loans to its parent companies. During the period 1997–2001 (the "control period"), the Company held no shareholders' meetings and did not contact the minority shareholders to tell them about the low-interest loans or the liens that had been placed in connection with the LBO (Am.Compl.¶¶ 116, 118). Furthermore, the defendants did not contact the minority shareholders to tell them the purpose of the management fees the Company paid during the control period or the basis for allocating various cost and revenue items on Company's books (Am.Compl.¶¶ 126–34).

At some point, one or more defendants offered to buy back stock from minority shareholders "in the Price Markets" (Am. Compl.¶ 135), but the amended complaint does not reveal whether these included any plaintiffs in this lawsuit.

In 2000, defendants PCC, Price Cellular, Price Holdings, and Price Wireless entered into an agreement with Verizon Wireless, Inc. for the sale of Price Wireless. As part of this agreement, these defendants agreed to "use commercially reasonable efforts" to acquire any minority holdings in Price Wireless' subsidiaries, including minority shareholders in the Company (Am.Compl.¶ 76).

In 2001, Palmer Wireless (still under the complete control of Price Wireless), which owned approximately 94.5% of the Compa-

ny's shares (Am.Compl.¶ 40), absorbed the Company in a short-form merger under *Del.Code Ann.* tit. 8, § 253. Afterwards, Palmer Wireless sent an eleven-page Information Statement (Compl.ex. 1), signed by Price as chairman of Palmer Wireless, to the minority shareholders of the Company. The Statement said that minority shareholders could take $7,342.30 per share or demand appraisal rights in the Delaware Court of Chancery (p. 1). It also gave the terms of the merger (pp. 3–4); explained how Palmer Wireless had arrived at the $7,342.30 figure by comparable acquisition valuation methodology (pp. 4–5); briefly discussed the tax consequences of the merger (p. 5); described the mechanics of the merger (pp. 6–8); and explained how a shareholder could exercise his appraisal rights under Delaware law (pp. 8–11). The statement also described the upcoming acquisition of Price Wireless by Verizon, stating that Company shareholders were not entitled to any consideration under the terms of that acquisition and telling them how to get more information on it from the SEC (pp. 5–6).

Figure 1 shows the relationships between the corporations involved in this case. The Company no longer exists, having been merged into Palmer Wireless, but the plaintiffs have informed the court that they listed it as a defendant in the event that the court orders rescission of the merger as a remedy, thereby bringing it back into existence.

## IV. DISCUSSION

### A. Standard for Dismissal under Rule 12(b)(6)

"When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

"The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test. . Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Id.*

■ In appraising the sufficiency of the complaint, courts follow the well-established rule that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The threshold for a complaint to survive a motion to dismiss is "exceedingly low." *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 703 (11th Cir.1985), *quoting Quality Foods de Centro America, S.A. v. Latin American Agribusiness Development Corp., S.A.,* 711 F.2d 989, 995 (11th Cir.1983). However, although the complaint must be read liberally in favor of the plaintiff, the court may not make liberal inferences beyond what has actually been alleged. "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Management, Ltd. v. Jaharis,* 297 F.3d 1182, 1188 (11th Cir.2002).

### B. Rule 12(b)(6) Applied to Federal Securities Fraud Claims

Counts 1 and 2 of the Amended Complaint charge that the Information Statement mailed after the 2001 short-form merger contained misleading statements, and so constituted a violation of §§ 10(b)

and 20(a) of the Securities Exchange Act of 1934 (Am.Compl.¶¶ 17, 31). Section 20(a) creates liability for any "person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder. . . ." Section 10(b) (15 U.S.C. § 78j(b)) empowers the Securities and Exchange Commission (SEC) to create rules and regulations to define what "manipulative or deceptive device[s] or contrivance[s]" are violations of the Act.. Rule 10b–5 (17 C.F.R. § 240.10b–5) is the actual regulation relied upon by Plaintiffs. Thus, if the Rule 10b–5 claim fails, there will be no claim under either § 10(b) or § 20(a). *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396–97 (11th Cir.1996).

▪ Rule 10b–5 provides that
[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. In the Eleventh Circuit, establishing a violation of Rule 10b–5 requires a plaintiff to show: "1) a misstatement or omission, 2) of a material fact, 3) made with scienter, 4) on which plaintiff relied, 5) that proximately caused his injury." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1281 (11th Cir.1999).

▪ The Supreme Court has held that no private plaintiff has standing to sue in a 10b–5 action unless he is a purchaser or seller of the securities in question. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 755, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). In addition, if the action is predicated upon false statements or omissions made by the defendants, the plaintiffs must demonstrate reliance on those statements, and that that reliance proximately caused the plaintiffs' damages. *Bryant,* 187 F.3d at 1281.

▪ The defendants contend that the plaintiffs, who lost their securities in a short-form merger and had no choice in the matter, did not *sell* those securities and consequently have no standing under *Blue Chip Stamps.* The defendants further contend that the plaintiffs cannot demonstrate reliance on the information statement or that any misstatements in it caused them any injury. The plaintiffs argue that the "forced sale" doctrine grants them standing as "sellers" of securities and excuses them from pleading or proving reliance and causation, but that they could prove these things if needed.

The forced sale doctrine is a judicially-created legal fiction that began with *Vine v. Beneficial Finance Co.*, 374 F.2d 627, 634 (2d Cir.1967). In that case, the plaintiffs used fraudulent means to get a 95% interest in a subsidiary, then used a short-form merger under New York law to eliminate the remaining shareholders. One of these shareholders brought a 10b–5 action, and the court treated him as a "forced seller" with standing to sue. On the subject of reliance and causation, the Second Circuit held that

[Reliance is] unnecessary in the limited instance when no volitional act is required and the result of a forced sale is exactly that intended by the wrongdoer. Since the complaint alleges that plaintiff, in effect, has been forced to divest him-

self of his stock and this is what defendants conspired to do, reliance by plaintiff on the claimed deception need not be shown. What must be shown is that there was deception...and that this was in fact the cause of plaintiff's claimed injury.

*Vine*, 374 F.2d at 635. The Second Circuit continued to require causation, but not reliance, in 10b–5 cases where the "sale" required no volitional act on the part of the plaintiff. *See, e.g., Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 797 (2d Cir.1969). More recently, that court reaffirmed and extended the causation requirement in *Grace v. Rosenstock*, 228 F.3d 40, 48–49 (2000).

The Fifth Circuit, citing *Vine*, adopted the doctrine in *Coffee v. Permian Corp.*, 434 F.2d 383 (5th Cir.1970) and reaffirmed it in *Alley v. Miramon*, 614 F.2d 1372, 1385 (5th Cir.1980) (arguing the consistency of *Vine* with *Blue Chip Stamps* ). The Fifth Circuit, like the Second, required

causation—specifically, "loss causation"—in forced sale cases, and rejected the argument that causation as well as reliance should be excused. *See Shores v. Sklar*, 647 F.2d 462, 480 (5th Cir.1981); *Falls v. Fickling*, 621 F.2d 1362, 1367 (5th Cir. 1980).[2]

Regardless of whether the forced sale doctrine remains or ought to remain[3] the law in this circuit, the language of *Vine* itself makes one thing clear: the doctrine does not excuse a plaintiff from pleading or proving causation. "What must be shown is that there was deception...and that this was in fact the cause of plaintiff's claimed injury." *Vine*, 374 F.2d at 635. The plaintiffs' contention that they need not prove causation in a "forced sale" case is incorrect. Unlike the plaintiffs in *Vine*, the plaintiffs here have not alleged that the defendants raised their controlling share above the short-form threshold by fraudulent means during the control period.[4] The plaintiffs' argument that the Su-

**2.** The Eleventh Circuit has never cited *Vine* in a published decision, though it did once refer to a "forced sale" in a 10b–5 case. *Friedlander v. Troutman, Sanders, Lockerman & Ashmore*, 788 F.2d 1500, 1501 (11th Cir.1986). That decision was concerned with the applicable statute of limitations only, and contained no discussion of reliance or causation. In any case, decisions of the former Fifth Circuit remain binding on the courts of this circuit until and unless they are overturned by decisions of this circuit. *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981).

**3.** Several courts have questioned the continuing validity of the doctrine in light of later Supreme Court precedent. *See Isquith v. Caremark International, Inc.*, 136 F.3d 531, 536 (7th Cir.1998); *Howe v. Bank for International Settlements*, 194 F.Supp.2d 6, 27 (D.Mass.2002). The defendants describe the doctrine as outmoded and urge the court to abandon it. However, no such decision is necessary to decide the issue at hand, because the plaintiffs' claims fail even with the doctrine, as shown below.

**4.** In the instant litigation, the short-form merger was perfected under Delaware law.

*See Del.Code Ann.* tit. 8, § 253. Under Delaware law, the majority shareholder must have at least 90% of the outstanding shares (of all relevant classes of stock) to order the merger. Here even before Palmer Wireless was taken over by Price (and the corporations controlled by Price), Palmer Wireless owned 92.3% of the Company (Am.Compl.¶ 47). There are no express allegations in the amended complaint that the 1997 Price Wireless leveraged buyout (as opposed to self-dealing transactions following the buyout) of Palmer Wireless made use of any misstatements or omissions that caused any harm to the defendants. Under these circumstances, the plaintiffs cannot claim that any misstatements or omissions in the Information Statement caused them injury in relation to a "forced sale." Furthermore, neither *Del.Code Ann.* tit. 8, § 253 nor any other Delaware law required the defendants to notify the plaintiffs of the details of the short form merger before it took place, and the plaintiffs therefore cannot claim a fraud by omission that caused them injury in connection with this merger. *See SEC v. Cochran*, 214 F.3d 1261, 1264–65 (10th Cir. 2000), *citing Chiarella v. United States*, 445

preme Court's decision in *Santa Fe Industries v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) implies that they should be excused from proving causation, because the court found that the defendants in that case had made no deceptive statements (as the plaintiffs allege the defendants here did in the Information Statement). However, the plaintiffs' reasoning is incorrect. The *Santa Fe* Court, finding no deception, found no fraud, and did not reach the question of causation.

■ The plaintiffs argue that, if they must, they can prove causation under the facts alleged in the complaint, arguing that "[i]f a reasonable businessman had to fully disclose the omitted facts, it is entirely likely that he would not have pushed the freeze-out merger to its completion" (citing *United States v. Margala,* 662 F.2d 622 (9th Cir.1981)). The Supreme Court addressed this argument in the § 14(b) context in *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1106–08, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). Relying on policy arguments (in the 10b–5 context) from *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 742–43, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Court concluded that proof of causation would be a nebulous matter and too difficult to resolve on pretrial motions if it could be predicated on the idea that defendants wanted minority shareholders' support even though their votes were not needed for a proposed merger. As the Court wrote,

> The same threats of speculative claims and procedural intractability [as in *Blue Chip Stamps*] are inherent in respondents' theory of causation linked through the directors' desire for a cos-

metic vote. Causation would turn on inferences about what the corporate directors would have thought and done without the minority shareholder approval unneeded to authorize action. A subsequently dissatisfied minority shareholder would have virtual license to allege that managerial timidity would have doomed corporate action but for the ostensible approval induced by a misleading statement, and opposing claims of hypothetical diffidence and hypothetical boldness on the part of directors would probably provide enough depositions in the usual case to preclude any judicial resolution short of the credibility judgments that can only come after trial. Reliable evidence would seldom exist...The issues would be hazy, their litigation protracted, and their resolution unreliable. Given a choice, we would reject any theory of causation that raised such prospects, and we reject this one.

*Virginia Bankshares,* 501 U.S. at 1105–06, 111 S.Ct. 2749. Causation in a securities fraud case requires more than the idea that the defendants would have been too embarrassed to proceed had they planned to tell all they should.

The plaintiffs further suggest that they had "other ways to protect themselves...including seeking injunctive relief, exposing the plan and creating adverse publicity or seeking to enlist the aid of federal and state prosecutors," and imply that the existence of these remedies satisfies the causation requirement. This argument is temporally unsound. The defendants did not make the allegedly mis-

---

U.S. 222, 233–35, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) (section 10(b) creates no duty to disclose beyond those found in other federal or state laws); *Del.Code Ann.* tit. 8, § 262(d)(2) (minority shareholders must be informed within ten days *after* a short-form merger takes place; this requirement would

be rendered meaningless by a requirement of prior notification in time to start a legal battle to enjoin the merger); *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 474 n. 13, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (Delaware law does not require notification before a short-form merger).

leading statements until after the short-form merger took place. Neither federal prosecutors nor injunctive relief nor adverse publicity could have prevented the merger then. As for post-merger relief, the complaint does not allege that the plaintiffs were tricked out of pursuing claims for appraisal and rescission, or any other claims; indeed, a claim for rescission is part of this action. The complaint simply does not allege any harm *caused* by misstatements or omissions in the Information Statement, and the 10b–5 claim, which relies exclusively on such misstatements and omissions, is therefore due to be dismissed.

As stated earlier, without the 10b–5 claim, no independent action remains under either § 10(b) or § 20(a). The claims under these sections, counts 1 and 2, are therefore due to be dismissed.

## C. Rule 12(b)(6) Applied to the RICO Conspiracy Claim

■ The amended complaint alleges that in addition to the alleged securities fraud perpetrated by the defendants through the forced sale and freeze-out merger, the defendants perpetrated additional fraud during "the acquisition and operation of the company"(Am.Compl.¶ 1(b)). The RICO claim relates to the latter fraud, which consisted of the defendants' not telling the plaintiffs about a "secret scheme to defraud the Company and minority shareholders through a pattern of concealed self-dealing transactions." *Id.* at 33. More specifically, the purpose of the scheme was to

(i) misappropriate[ ] the assets of the Company through the creation of illegal liens; (ii) conceal[ ] the creation of the liens . . . ; (iii) divert[ ] available cash to [Defendants]; and (iv) fail[ ] to account for the benefits received from improper use of the Company's assets including a share of the benefits to be received by

Defendants from the sale of the Company . . . .

(Am.Compl.¶ 115).

Title 18, section 1964(c) of the United States Code provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court." Sections 1962(a), (b), and (c) require a "pattern of racketeering activity" to establish violations. Section 1962(d) requires only a conspiracy to violate any of the previous three subsections. Section 1961(5) provides that a " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." Section 1961(1) defines "racketeering activity" as including any act which is indictable under any one of many federal statutes, including 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

Count three is brought against all defendants except Cellular Systems of Southeast Alabama, Inc. ("the Company") which no longer exists and has not existed since Palmer Wireless absorbed the Company by short-form merger. Count three alleges that, in connection with the May 1997 Palmer–Price LBO, the defendants placed illegal liens on the assets of the Company and Dothan Cellular and caused the Company to make low-interest loans to themselves to pay interest on the LBO debt and for other purposes (Am.Compl.¶ 1(b) (fraud surrounding acquisition and operation of the Company started in May 1997); *but see* ¶ 14 (noting October 1997 for the start of the pattern of self-dealing); ¶ 64 (October 1997 was date of closing of Palmer acquisition)). The plaintiffs allege that the defendants breached a fiduciary duty

by not telling them about these liens and loans, and that this breach constituted mail and wire fraud because the defendants communicated by mail and interstate wire in the process of creating the liens and setting up the loans. The plaintiffs allege that the offers to repurchase minority interests were made by mail and constituted mail fraud. The plaintiffs also allege that the Information Statement sent in connection with the short-form merger contained misleading statements and omissions of material facts, so that sending it through the mail was an act of mail fraud (Am. Compl.¶¶ 138, 139). The plaintiffs contend that the nondisclosures and misstatements, stretching over a period of several years, constituted a pattern of racketeering activity, and claim damages under 18 U.S.C. § 1964(c), based on violations of §§ 1962(a), (b), (c), and (d).

The defendants allege that the plaintiffs' description of a RICO conspiracy under 18 U.S.C. § 1962(d) fails to state a claim in that it fails specifically to allege an *agreement* between the defendants, or to specify the role of *each* defendant in reaching such an agreement. The plaintiffs contend that "[t]he RICO conspiracy is established by, among other things, Defendant Robert Price acting as the CEO of each of the Price Companies to carry out the overall scheme to defraud Plaintiffs," and that "each use of interstate mails or 'wires' by him while wearing his various 'hats' ... supports the conspiracy claim." In fact, the plaintiffs' own argument defeats the conspiracy claim. Robert Price was CEO and president of defendant Price Commu-

nications Corporation during the control period (Am.Compl.¶ 52). Price was CEO of Price Cellular, Price Holdings, and Price Wireless since 1997 (Am. Compl.¶ 42).[5] Price dominated Palmer Wireless (Am.Compl.¶ 41). At all times relevant to the RICO claim, all corporate defendants except the Company, which no longer exists, lay in a chain of wholly-owned subsidiaries. As the Supreme Court observed in the antitrust context:

> [a] parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal 'agreement,' the subsidiary acts for the benefit of the parent, its sole shareholder.

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). The Court held that, in the antitrust context, a parent and its wholly-owned subsidiary cannot be held to have conspired. *Id.* at 770–77, 104 S.Ct. 2731.

Although the complaint names six defendants with regard to the RICO conspiracy claim—Robert Price, four "Price" Entities, and Palmer Holdings—the complaint also makes clear that only Robert Price and the "Price" entities were members of the alleged RICO conspiracy, and not Palmer Holdings (Am.Compl.¶ 115)

---

**5.** It is unclear if defendant Price became CEO of Price Cellular, Price Holdings, and Price Wireless when they were initially formed for the purposes of the LBO. It is *possible* to imagine that Price became CEO late in 1997 after the LBO and after the first acts of alleged self-dealing (and other alleged wrongs) had begun, but there are no specific allegations in the amended complaint to this effect.

Moreover, if Price was not responsible for those alleged wrongs, the amended complaint fails to name as defendants the corporate officers who had control of the corporate defendants at that time. Similarly, there is no allegation in the amended complaint that Price engaged in any illegal or conspiratorial behavior at a time when he was *not* an officer of the corporate defendants.

("Defendant Robert Price together with Defendant PCC and the other *Price* Companies shared a common purpose to deprive the Company and Plaintiffs of the full benefits of their ownership interests ....") (emphasis added); *see also United States v. Church*, 955 F.2d 688, 694 (11th Cir.1992) ("Agreement to participate in a RICO conspiracy ... can be proved in either one of two ways: (1) *by showing an agreement on an overall objective;* or (2) ... by showing that a defendant agreed personally to commit two predicate acts") (citations and quotation marks omitted) (emphasis added). Once Palmer Holdings is removed from the alleged conspiracy, a fair reading of the amended complaint indicates that Price was an officer during the control period of all the remaining corporate defendants alleged to be members of the RICO conspiracy. Under the intracorporate conspiracy doctrine, a corporate officer cannot be held to conspire with his own corporation. *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir.2000) ("it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself").

Whether or not the intracorporate conspiracy doctrine announced in *Copperweld* and *McAndrew* applies to a civil claim brought under § 1962(d) is an unsettled question of law. There is no on-point decision of the Eleventh Circuit answering this precise question. There is, however, substantial persuasive authority from within this circuit holding that interrelated corporate entities and their employees cannot form a § 1962(d) conspiracy. *See In re Managed Care Litigation*, 150 F.Supp.2d 1330, 1350, 1352 (S.D.Fla.2001) (§ 1962(d) conspiracy for violating § 1962(a) and § 1962(c) is not possible between corporation and wholly owned subsidiary); *San Jacinto Savings Ass'n v. TDC Corp. of Florida*, 707 F.Supp. 1579, 1581 (M.D.Fla. 1989); *see also Fogie v. THORN Americas, Inc.*, 190 F.3d 889, 898–99 (8th Cir.

1999) (§ 1962(d) conspiracy for violating § 1962(c) is not possible between corporation and wholly owned subsidiary).

The court finds the reasoning of *San Jacinto Savings* persuasive. In that case, the district court held, in the context of a civil RICO conspiracy claim, that as "[a]s a general rule, a corporation and its employees, and a corporation and its subsidiaries, are incapable of engaging in a civil conspiracy ... The exception is when the officer or employee has an independent personal stake in achieving the corporation's illegal objective." 707 F.Supp. at 1581. The amended complaint alleges no personal stake of Robert Price independent of those of the Price entities he created and controlled. *See* Am. Compl ¶ 41 (Robert Price dominated PCC and its direct subsidiaries—including all Defendants to the RICO conspiracy claim); *see also* Am. Compl. ¶ 82 (all Price entities and Palmer Holdings are alter egos); Am. Compl ¶ 80 (Price was CEO of all Price entities and Palmer Holdings at time of freeze-out); Information Statement at 1 (Information Statement signed by Robert Price as Chairman of Palmer Wireless).

In short, the defendants could not conspire with one another. Robert Price could not conspire with the corporate defendants he created or controlled, the corporate defendants could not conspire with their wholly owned subsidiaries, and the RICO conspiracy claim must therefore be dismissed. Because the court concludes that application of Rule 9(b) of the Federal Rules of Civil Procedure resolves the remaining federal issues in this case, the court pretermits discussion of Rule 12(b)(6) with respect to the remaining claims.

**D. Standard for Dismissal Under Rule 9(b) in RICO Cases**

Rule 9(b) of the Federal Rules of Civil Procedure provides that, "[i]n all

averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Fed. R.Civ.P.* 9(b). This rule "serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" *Brooks v. Blue Cross & Blue Shield,* 116 F.3d 1364, 1370–71 (11th Cir.1997) (citing *Durham v. Business Management Assoc.,* 847 F.2d 1505, 1511 (11th Cir.1988)). Further, "Rule 9(b) must be read in conjunction with Rule 8(a) [of the Federal Rules of Civil Procedure], which requires a plaintiff to plead only a short, plain statement of the grounds upon which he is entitled to relief." *Id.* (quoting *O'Brien v. National Property Analysts Partners,* 719 F.Supp. 222, 225 (S.D.N.Y.1989)); *see also Durham,* 847 F.2d at 1511 (stating that "[t]he application of [Rule 9(b) ] must not abrogate the concept of notice pleading"). Rule 9(b) applies to RICO actions based on mail or wire fraud. *Durham,* 847 F.2d at 1511.

 Under current Eleventh Circuit law, with respect to fraud, Rule 9(b) may be satisfied if the complaint sets forth the following: "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a conse-quence of the fraud." *United States ex rel Clausen v. Laboratory Corp. of America,* 290 F.3d 1301, 1310 (11th Cir.2002), *citing Ziemba v. Cascade International, Inc.,* 256 F.3d 1194, 1202 (11th Cir.2001). In a RICO case, all the elements of at least two predicate acts, including any requisite scienter, must be alleged with supporting facts. *Republic of Panama v. BCCI Holdings (Luxembourg),* 119 F.3d 935, 949 (11th Cir.1997) (a RICO "plaintiff must allege facts sufficient to support each of the statutory elements for at least two of the pleaded predicate acts"). In other words, the Eleventh Circuit reads the particularity requirement of 9(b) as extending not only to the "fraudulent scheme" element of the mail and wire fraud statutes (when used as RICO predicates), but to the other elements (use of mail and wires) as well. *Durham,* 847 F.2d at 1512.

As noted above, a charge of mail or wire fraud requires "use of" the mails or interstate wires in furtherance of a scheme to defraud. Indeed, it is the *use* of mail or wire in furtherance of a scheme to defraud, rather than the scheme to defraud itself, that constitutes the violation of 18 U.S.C. § 1341 or 1343 [6] and hence the predicate act for a RICO claim. To survive a motion to dismiss, the amended complaint must allege sufficient facts supporting at least two such violations.

### E. Rule 9(b) Applied to Non–Conspiracy RICO Claims

The defendants argue that the plaintiffs' allegations about the defendants' use of the mails and wires are conclusory and do not meet the standards of 9(b). In para-

---

**6.** "Whoever, having devised ... any scheme or artifice to defraud ... for the purpose of executing such scheme ... places in any post office ... any matter or thing whatever ... to be delivered by the Postal Service ... shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1341 (mail fraud).

"Whoever, having devised ... any scheme or artifice to defraud ... transmits ... by means of wire ... any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme ... shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1343 (wire fraud).

graph 138 of the amended complaint, the plaintiffs allege that

> [the] acts in which Defendant Robert Price, PCC and the other Price Companies engaged as alleged above involved, during all relevant times, two or more of the following acts, each of which is an act of racketeering activity within the meaning of 18 U.S.C. § 1961(1):
>
> a. Repeatedly using the United States mails to further their fraudulent scheme, all in violation of 18 U.S.C. § 1341 (mail fraud); and
>
> b. Repeatedly using interstate means of communications to further their fraudulent scheme, all in violation of 18 U.S.C. § 1343 (wire fraud);
>
> c. The utilization of the means and instrumentalities of interstate commerce, including the use of the telephone and the United States mails (i) to communicate between Defendants' offices in Fort Myers, Florida, New York, New York and Englewood, New Jersey, (ii) to exchange information and agreements between Defendants at their various locations and the Chicago Branch of the Bank of Montreal in Illinois to implement the pledge of the assets of the Company and Dothan Cellular, (iii) to communicate between Defendants at one of [sic] more of their offices and the Company and Dothan Cellular in Alabama to make arrangements for the upstream advances of available cash flow, (iv) to send letters from Defendants' Fort Myers, Florida offices to Plaintiffs and other minority shareholders offering to repurchase their interests, and (v) to mail the Information Statements to Plaintiffs and others informing them of the freeze-out mergers.

Paragraph 139 alleges that "[e]ach of the above uses of the mails and interstate telephones in furtherance of the fraudulent scheme is a separate violation of the mail and [wire] fraud statutes." Other than ¶ 135, no other allegations in the amended complaint expressly describe mail or wire transactions relating to the RICO fraud allegations.[7]

Subparagraphs (a) and (b) of paragraph 138 contain legal conclusions ("to further their fraudulent scheme"; "in violation of . . ."), not factual allegations. They are facially insufficient as factual allegations supporting mail or wire fraud.

Of the more specific acts listed in subparagraph (c), subsection (i) obviously does not describe a RICO violation or a predicate act. There is no factual allegation that any particular communication was in furtherance of the fraudulent scheme. *See* 18 U.S.C. § 1341 (mailing for "the purpose of executing" the fraudulent scheme); 18 U.S.C. § 1343 (use of wires for "the purpose of executing" the fraudulent scheme).

 With respect to subsections (ii) and (iii), the general rule in this circuit is that a complaint alleging mail or wire fraud as a predicate act for RICO must give some details of at least two mailings or wire transactions. In *Brooks v. Blue Cross & Blue Shield,* 116 F.3d 1364, 1380–81 (11th Cir.1997), the United States District Court for the Southern District of Florida[8] examined a complaint containing

---

**7.** Paragraphs 126–134 and 136 suggest that the defendants' failure to inform the plaintiffs about the purpose of the management fees the Company paid during the control period or the basis for allocating various cost and revenue items on Palmer Wireless' books constituted fraud. However, paragraph 138 does not expressly link these nondisclosures to any particular mail or wire transaction.

**8.** The Eleventh Circuit reproduced the district court's opinion and adopted part of it without reaching the issues discussed here.

RICO allegations based on mail and wire fraud. The defendants in that case were accused of selling insurance in violation of the Medicare Secondary Payer (MSP) statute; the alleged fraud lay in representing to the buyers that the insurance sales were legal. To establish *mail* and *wire* fraud, the plaintiffs included the following allegations in their complaint:

a. Mail fraud in violation of 18 U.S.C. § 1341 in that the Group Health Insurance Defendants together with and/or assisted by Blue Cross of Florida intentionally used the U.S. mails in furtherance of the scheme and transmitted group health plan information, claim forms, Medicare claims, claim reimbursements and Medicare payments, and otherwise conducted their business through the mails, including regular transmissions of communications containing or based upon the Group Health Insurance Defendants' false assertions with regard to the MSP statute, each mailing constituting a separate mail fraud violation; and

b. Wire fraud in violation of 18 U.S.C. § 1343 in that the Group Health Insurance Defendants together with and/or assisted by Blue Cross of Florida intentionally engaged in telephone conversations or used wire transmissions in fur-

therance of the scheme, including transmittal of group health plan information, solicitation of coverage, payment of premiums or payment of secondary, rather than primary insurance coverage, and including regular communications concerning or based upon the Group Health Insurance Defendants' false assertions with regard to the MSP statute, each of which communications constitute [sic] a separate wire fraud violation.

The district court held that these descriptions did not satisfy the pleading requirements of 9(b) and that the claims based on them were due to be dismissed, because they did not include the time, place, or manner of any specific predicate act.[9] Here, as there, the plaintiffs have alleged many communications, but have not supplied the details of even one, such as who sent it, how it was sent (whether by mail, telephone, or other means; subsections (c)(ii) and (c)(iii) of paragraph 138 assert only that one or another of these means was used in each of many communications), when it was sent, who received it, or how it furthered the fraudulent scheme. Lacking notice of these particulars, the defendants have been unable to respond effectively to the "predicate act" and "pattern" elements of the plaintiffs' RICO allegations.[10] The descriptions of mailings

**9.** The plaintiffs cite *Durham v. Business Management Associates*, 847 F.2d 1505, 1511–12 & n. 11 (11th Cir.1988), in which the Eleventh Circuit found that an allegation that "[c]orrespondence and other communications concerning the [fraudulent scheme] took place through...the mails" satisfied the pleading requirements of 9(b). However, the plaintiffs in that case had provided an affidavit that described specific letters (the 9(b) challenge came with a motion for summary judgment), and only in combination with this affidavit did the challenged pleading satisfy the requirement.

**10.** For example, in arguing this motion, the defendants argued that mailings connected with the 2001 short-form merger surrounded

a "one time event" and did not establish a pattern; the plaintiffs responded that the entire mailings *they* had in mind spanned the entire four-year period. Allegations based on mailings from the early part of the control period might be time barred, but the defendants have no way to make such an argument or apply it to the "pattern" requirement; the plaintiffs can always claim they meant *other* mailings not specified in the complaint, and conveniently spanning the entire limitations period. Contrary to the plaintiffs' assertions, neither *every* communication made by Price while wearing "one of his various hats" nor every communication between the defendant corporations must have been "for the purpose of executing" the scheme to defraud by silence, but the defendants cannot argue the applica-

and wire transactions in parts (ii) and (iii) of subparagraph (c) do not meet the standards of Rule 9(b).

Paragraph 138(c)(v) alleges that the mailing of the Information Statement to Plaintiffs and others was in violation of the mail fraud statute and a predicate act with regard to the RICO claim. The RICO claim relates to alleged fraud by omission committed during the acquisition and operation of the Company (*see* am.compl. ¶ 1(b)). Once the defendants effectuated the short-form merger, the Information Statement could not have furthered any continued fraud against the former minority shareholders.[11]

 Finally, neither paragraph 135,[12] nor paragraph 138(c)(iv) sufficiently describes a RICO violation or a predicate act under the mail fraud statute. The court takes for granted that the letters described in ¶ 138(c)(iv) are the same letters described in ¶ 135; otherwise the letters described in the prior section lack all specificity as required by Rule 9(b). The plaintiffs have not pled with particularity predicate acts that meet the pattern requirement of RICO. As stated above, 18 U.S.C. § 1962(a-c) violations require a "pattern of racketeering activity." Section 1961(5) provides that a pattern of racketeering activity requires at least acts of

racketeering activity one of which occurred after the effective date of the RICO statute and the second of which occurred within ten years after the commission of the prior racketeering act. Paragraph 135 alleges the existence of a single letter sent on or about April 21, 1999. No second letter is alleged—at least none during the period of acquisition and operation prior to the short-form merger. Nor is there any allegation that this particular letter was transmitted continuously over a substantial period of time to discrete minority shareholders. The plaintiffs cannot simply argue that two such letters were sent to two different minority shareholders on or about April 21, 1999 and that two such letters qualify as two different predicate acts under the mail fraud statute. The Supreme Court has held that the two or more predicate acts must demonstrate "continuity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). " 'Continuity' [refers] to a closed period of repeated conduct ... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a *substantial period of time*. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do

bility of the statute to a specific communication because no communications have been specified. Rule 9(b) serves to put a defendant accused of fraud on notice of the *particulars* of the case against him, and as read by the Eleventh Circuit in RICO cases, that includes notice of the particular mailings and wire conversations used as predicate acts.

**11.** *See also* this court's order of Mar. 6, 2002 (doc. # 20) ("If any of the alleged fraudulent acts of Defendants were not made *during* one of the transactions, then Plaintiffs need to specify how such fraud affected the transactions or otherwise violates federal law.")

**12.** Am. Compl. ¶ 135 ("In furtherance of their plan to induce minority shareholders to

sell their shares to Defendants for unfair consideration with no financial and operating disclosures, Defendants withheld dividends and made 'offers' to the minority shareholders to sell their shares at unfairly low prices. The attempts to repurchase minority interests for unfairly low prices is evidenced by a letter dated April 21, 1999, which was widely circulated to minority owners, in which Defendant Robert Price stated that Price Wireless had acquired 93,000 'pops' from minority owners in the Price Markets, including minority shareholders of the Company for $76 per 'pop' and offered to buy more units for a slightly better price, $80 per 'pop.' ").

not satisfy this requirement ...." *Id.* at 241–42, 109 S.Ct. 2893. *See also Cox v. Administrator U.S. Steel & Carnegie,* 17 F.3d 1386, 1397 (11th Cir.1994); *Aldridge v. Lily–Tulip, Inc. Salary Retirement Benefits Committee,* 953 F.2d 587, 593 (11th Cir.1992) (a fraud requiring the use of the mails for six months was "accomplished in too short a period of time ... to qualify as a pattern of racketeering activity"). A single letter sent on or about April 21, 1999 cannot constitute a pattern.

For the reasons stated above, the RICO claims in the amended complaint do not met the standards of Rule 9(b) as applied by this circuit, and are therefore due to be dismissed.

### F. Claims under State Law

 As shown above, all federal claims in this action are due to be dismissed. Complete diversity does not exist between the parties, and the court therefore lacks original jurisdiction over any remaining state law claim. Under 28 U.S.C. § 1367(c)(3), the court may decline to exercise supplemental jurisdiction over state law claims if "the district court has dismissed all claims over which it has original jurisdiction." In deciding whether to do so, the court should "take into account concerns of comity, judicial economy, convenience, fairness, and the like." *Lewis v. City of St. Petersburg,* 260 F.3d 1260, 1267 (11th Cir.2001), *quoting Crosby v. Paulk,* 187 F.3d 1339, 1352 (11th Cir.1999).

 The plaintiffs do not deny that they can bring (and, indeed, have brought) [13] an appraisal action in the Delaware Court of Chancery—a state court specializing in intracorporate disputes. In an appraisal action, that court *must* take into account *all* relevant factors in determining the appropriate price for Plaintiffs' stock, "including damages and elements of future value, where appropriate." *Glassman v. Unocal Exploration Corp.,* 777 A.2d 242, 248 (Del.2001).[14] If fraud or breaches of fiduciary duty by the defendants lowered the value of Plaintiffs' stock, or if the plaintiffs are due a share of the proceeds from the Verizon transaction, these are both matters the presiding chancellor (or vice-chancellor) is required to take into account. Considerations of fairness and judicial economy suggest that the plaintiffs' right to recover for the alleged wrongs and the associated legal and factual issues be considered by one court in one action, rather than by two courts in two separate actions.

The plaintiffs have submitted the cases of *Erickson v. Centennial Beauregard Cellular, L.L.C.,* 2003 WL 1878583 (Del.Ch. Apr.11, 2003) and *In re Pure Resources, Inc. Shareholders Litigation,* 808 A.2d 421 (Del.Ch.2002) as supplemental authority. The relevance of these cases to the current action is doubtful (the "corporate common law" questions discussed in *Pure Resources,* by the terms of that case, do not apply to short-form mergers (*see* 808 A.2d at 434 & n. 14) and the opinion in *Erickson*

**13.** *See* doc. # 36, ex. B (plaintiffs' petition for appraisal before the Delaware Court of Chancery). In making a determination with regard to exercising or declining supplemental jurisdiction the court is not limited to the face of the amended complaint. *See* 28 U.S.C. § 1367. Declining or exercising supplemental jurisdiction is discretionary. *Lewis,* 260 F.3d at 1267.

**14.** Plaintiffs' assertion (in their letter accompanying the submission of supplemental authority) that the Delaware courts would look only at the value of the stock at the moment of the merger, and not at the defendants' culpability in making the value so low, is thus shown to be incorrect. However, even if Delaware law requires the plaintiffs to bring separate actions to assert their full rights against these defendants, nothing should prevent the plaintiffs from doing so; by operation of 28 U.S.C. § 1367(d), any relevant limitations period has been stayed pending resolution of this action.

does not clearly indicate that the cause of action in that case was one of those before this court).[15] These cases do, however, illustrate at great length the rich and evolving nature of Delaware merger law, and strengthen the court's conviction that the state law questions raised by the plaintiffs' suit should be considered, decided, and reviewed by the courts of that state. The court will therefore exercise its discre- tion under 28 U.S.C. § 1367(c)(3) and dismiss the claims under state law.

## V. CONCLUSION

For the foregoing reasons, it is OR-DERED that the defendants' motion to dismiss the plaintiffs' amended complaint be and hereby is GRANTED. A separate judgment will be entered in accordance with this order.

---

**15.** The plaintiffs have also submitted evidence that the defendants' dealings with Verizon Wireless have not proceeded as smoothly as desired. The relevance of this evidence to the claims before this court is unclear; however, it does not modify the court's findings with respect to the federal claims, nor does it convince the court that the state law actions should proceed here.